**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Scott M. FAWLEY, Defendant–Appellant.**

**No. 96–3360.**

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1997.

Decided Feb. 17, 1998.

David H. Hoff (argued), Office of the United States Attorney, Urbana Division, Urbana, IL, for Plaintiff–Appellee.

J. Steven Beckett, Carol A. Dison (argued), Beckett & Webber, Urbana, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

On September 13, 1995, the defendant-appellant, Scott Fawley ("Fawley"), a former employee of the Charles Klehm & Son Nursery ("Klehm Nursery") in Champaign, Illinois, was called before a federal grand jury and testified concerning the criminal investigation of Kit Klehm ("Klehm"), owner of the Klehm Nursery, regarding Klehm's harboring and employment of illegal aliens. On September 28, 1995, a grand jury returned an indictment charging Fawley with one count of perjury, in violation of 18 U.S.C. § 1623. Following a trial, Fawley was convicted of perjury and was sentenced to a term of 12 months imprisonment, two years of supervised release, and received a $50 assessment. The defendant appealed the district court's decisions in: (1) allowing the Government to present evidence of the illegal aliens' living conditions; (2) providing the jury with an "ostrich" instruction; (3) prohibiting the defendant from offering two jury instructions; and (4) allowing a convicted defense witness, Klehm, to state the names of several illegal aliens Klehm had harbored. We approve the trial court's rulings in allowing the evidence of the aliens' living conditions to be admitted, in providing the "ostrich" jury instruction, and in allowing the witness Klehm to state the names of the aliens he had harbored. We reverse and remand for a new trial because the defendant was prevented from instructing the jury that a unanimous verdict had to be reached on each of the defendant's statements which formed the basis for the perjury indictment.

## I. BACKGROUND

### A. Defendant's Involvement with Klehm

The defendant-appellant, Fawley, began working for Klehm at the Klehm Nursery in Champaign in July of 1994. Fawley assisted in the management of the nursery and its daily operations. Along with repairing machinery and maintaining buildings, Fawley's duties included distributing paychecks and transporting Klehm's workers to other jobs that they might have held at the time. Faw-ley also acted as an interpreter for Klehm when Klehm was having difficulty communicating with his Spanish-speaking employees. Fawley explained to the workers in Spanish what they were to do, usually on instruction from Klehm.

### B. Klehm's Employment of Illegal Aliens

During Fawley's tenure at the nursery, approximately fifty illegal Mexican aliens, few of whom spoke English, worked at the nursery and were assigned various labor-intensive tasks, including the staking up of peonie plants in the fields as well as cleaning, cutting, and preparing peonie roots for shipment. Klehm also operated an employment agency called "Temporary Services, Inc.," to assist the illegal aliens in gaining employment during the slow winter season.

The workers lived year-round in residences, which Klehm owned, located at 1501 Queensway, 1213 Redwood, 1118 West Church, 1524 Hollyhill, and 1405 Fairfax, all in Champaign. The inhabitants of the Queensway apartments paid a total of $1,600 per month in rent, while the inhabitants at the Redwood unit paid a total of $800 per month. Both of the housing units were well over capacity; in fact the Queensway dwellings had beds for only six, while a total of sixteen people were living there at one point. Both of Klehm's rental houses were in deplorable shape, with cockroaches and piles of garbage in the kitchen and furnace areas.

### C. The Government's Investigation of Klehm's Employees

In January of 1995, Thomas Merchant ("Merchant"), an agent with the Immigration and Naturalization Service ("INS"), received information from an undocumented alien and former employee of the Klehm Nursery, Hugh Phillips ("Phillips"), that Klehm was harboring and employing illegal aliens. As a result, the INS initiated a three month investigation of Klehm's operations.

On March 16, 1995, search warrants were executed at the houses where the workers resided, Klehm's home, and the nursery. The agents arrested a total of 30 illegal aliens, 27 of whom were employees of

Klehm's between July of 1994 and March of 1995.[1] The agents also seized numerous counterfeit Alien Registration Receipt cards, expired Temporary Receipt Cards and counterfeit social security cards.

### D. Klehm's Grand Jury Investigation

In the course of the Government's grand jury investigation of Klehm, the prosecutor became aware that Fawley had worked at the nursery and maintained a close relationship with Klehm. Thus, the Government subpoenaed Fawley to testify before Klehm's grand jury. Prior to his testimony, Fawley met with Assistant United States Attorney Lawrence S. Beaumont ("Beaumont"). During interviews with a number of Klehm's alien employees, the prosecutor learned that Fawley had acted as an interpreter for Klehm and been present during several conversations between Klehm and his workers when the aliens' illegal status was discussed. Beaumont asked Fawley whether he had "any knowledge whatsoever" regarding Klehm's employment of illegal aliens. When Fawley responded that he did not, U.S. Attorney Beaumont told him that he did not believe him, that he (Fawley) was obstructing the Government's case against Klehm, and further that if Fawley continued to lie, he would go to prison. Beaumont also inquired of Fawley whether he had instructed several of the illegal aliens to leave Champaign to avoid testifying before the grand jury. Fawley stated that he had not.

Later that day, Beaumont called Fawley before the grand jury and again warned him before testifying that if he answered any material question falsely, he would be charged with perjury and imprisoned. He proceeded to ask Fawley approximately 15 questions to determine the extent of his knowledge as to the existence of illegal aliens at the nursery. The defendant denied having any knowledge of the aliens prior to March 16, 1995 (the date of the INS raid), and this outright denial became the foundation of the first of the two substantive statements contained in the perjury indictment later issued against him. During a hearing before the grand jury, Beaumont also asked

Fawley at least four times whether or not he had ever stated to the aliens that it would be better if they returned to Mexico prior to Klehm's trial. Fawley denied this allegation, which eventually became the basis for the second of the two substantive statements contained in the indictment.

### E. Defendant's Perjury Trial

 Fawley went to trial on April 23, 1996, charged in an indictment that on September 13, 1995, appearing as a witness before the federal grand jury, he committed perjury when he falsely answered the following questions:

Q. Prior to March 16, 1995, did you have any knowledge that any of the employees at Klehm nurseries were illegal aliens?

A. Did I know, no, I did not know.

Q. All right. Did you have any knowledge whatsoever?

A. No.

* * *

Q. Have you ever told any of the aliens, the Mexicans, that it would be better if they left the country?

A. No.

Q. Have you ever told any of the aliens that it would be better if they left Champaign?

A. No.

Under 18 U.S.C. § 1623, perjury is defined as the crime of making false material declarations while under oath before a federal grand jury or court. More specifically:

Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

---

1. Fawley was working for Klehm during this same time frame.

Perjury is " 'the willful intent to provide false testimony, rather than ... [the] result of confusion, mistake, or faulty memory.' " *United States v. Hickok,* 77 F.3d 992, 1006–07 (7th Cir.1996) (quoting *United States v. Dunnigan,* 507 U.S. 87, 93, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993)).

### 1. The Testimony of Klehm's Former Employees

In establishing that Fawley had made false statements before the grand jury, the Government used the in-court testimony of four of Klehm's illegal Mexican employees. The four aliens, Salud Rivera ("Rivera"), Augustin Tapia Torres ("Torres"), Victoriano Martinez ("Martinez"), and Angel Bazan–Martinez ("Bazan–Martinez"), presented testimony in support of the Government's claim that Fawley had knowledge that Klehm's employees were illegal aliens. Specifically, Rivera testified that one month after he began working for Klehm in 1991, he had a conversation with Klehm and Fawley during which Klehm stated to Fawley that Rivera did not have proper documentation to work legally in the United States and that Rivera's false documents were printed under the assumed name of "Juan Fabuz." Rivera also testified that in 1994, Fawley had asked Rivera why his paycheck was made out in the name of "Fabuz." Rivera responded that he did not have proper documents to hold a job in the United States legally, and as such, he used false documents to remain. Another illegal alien, Torres, testified that from July of 1994 until March of 1995, Fawley delivered his paycheck to him almost every weekend, and although the check bore another assumed name, Fawley continued to address him by his given name, Torres. Martinez testified that during a conversation with Klehm and Fawley in September of 1994, he asked Klehm for and received a loan of $100 to purchase false work papers for his uncle, Bazan–Martinez, who likewise had illegally entered the United States and wished to work for Klehm. Bazan–Martinez testified that he had on an earlier occasion displayed his papers to Fawley and, after reviewing the same, Fawley shook his head and told Bazan–Martinez that they "were not any good." Martinez testified about another conversation in Fawley's presence in the fall of 1994 during which Martinez asked Klehm for money to help his family buy more false papers. Bazan-Martinez testified that shortly after the INS raid in March of 1995, Fawley suggested to Bazan-Martinez that he return to Mexico to avoid being imprisoned. A short time later, Fawley made a similar suggestion to Bazan–Martinez as well as his nephew, Martinez.

### 2. Defendant's Objections at Trial

Later in Fawley's trial, Klehm was called as a witness. Klehm, during questioning on direct examination, affirmed that he had previously been convicted of a felony. On cross-examination by the Government, Klehm was asked to identify the type of felony violation as well as the date of its occurrence. Klehm acknowledged that he had been convicted less than a month earlier of harboring illegal aliens, namely Torres, Rivera, Martinez and Bazan–Martinez, all of whom were witnesses at Fawley's trial. This evidence was objected to on the grounds that such an admission would unfairly bolster the aliens' testimony at Fawley's trial. The court overruled the objection and, in admitting the evidence, instructed the jury that the fact that Klehm had been convicted of a felony could be used against him only for the purpose of assessing Klehm's credibility and could not be considered for any other purpose.

The defendant likewise objected to the introduction of evidence of the aliens' living conditions, contending that such evidence was inadmissible due to the fact that it was irrelevant and would only serve to prejudice the defendant. In reply to this objection, the Government argued that the evidence of the aliens' living conditions should be admitted because it was an important factor in determining whether the aliens were or were not illegally in the United States. The prosecutor, in support of his position, offered the testimony of INS Agent Merchant:

> Based on my experience as an immigration agent, you take the totality of the circumstances, the living conditions, the manner of dress, the speech, and everything else that goes along with this in determining whether a person is an illegal alien or not.

In totality, it would lead me to believe that these people were illegal aliens.

At the close of testimony, the parties met in conference with the presiding judge to offer proposed jury instructions. The Government submitted an instruction providing, in part, "to convict you must unanimously agree that at least one of the answers given by the defendant as charged in the indictment was false." Fawley, on the other hand, sought to instruct jury members that they "must not find the defendant guilty unless [they] all agree, unanimously, that one particular answer [in the indictment] is false. It is not enough that [they] all believe that some answer given by the defendant is false." The court rejected Fawley's instruction over his objection, and instead opted for the Government's proffer. Fawley also objected to the court's use of an "ostrich" instruction, which allowed the jury to infer the defendant's knowledge of Klehm's harboring of illegal aliens. The name "ostrich," or "conscious avoidance," is derived from the inference that "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *United States v. Caliendo,* 910 F.2d 429, 433 (7th Cir.1990). The jury returned a verdict of guilty and the defendant was sentenced to twelve months imprisonment.

## II. ISSUES

On appeal, Fawley asserts that the district court committed reversible error in convicting him of perjury in violation 18 U.S.C. § 1623. Specifically, the defendant-appellant contends that: (1) the trial court abused its discretion in admitting evidence of the illegal aliens' living conditions in violation of Rules 401, 402, and 403 of the Federal Rules of Evidence; (2) the district court abused its discretion in giving the jury its "ostrich" or "conscious avoidance" instruction; (3) the district court improperly rejected Fawley's requested instructions regarding Fawley's understanding of the word "knowledge," and alternative language describing the requirement for a unanimous verdict in the perjury trial; and (4) not withstanding having given a limiting instruction, the trial court nevertheless abused its discretion in allowing the Government to elicit on cross-examination the fact that a witness was convicted of harboring illegal aliens in March of 1996.

## III. DISCUSSION

### A. Standard of Review

When dealing with the issues of admitting evidence of the aliens' living conditions, allowing the Government to elicit on cross-examination evidence of a witness's prior crimes, as well as the giving of the "ostrich" instruction, we apply the abuse of discretion standard of review. Because the trial court is in the best position to make decisions regarding jury guidance and evidentiary matters, the appellate court must give special deference to the rulings of the trial court. *United States v. Covarrubias,* 65 F.3d 1362, 1370 (7th Cir.1995). As this Court explained in *United States v. Hughes,* 970 F.2d 227, 232 (7th Cir.1992) (citation and internal quotations omitted), "an abuse of discretion generally occurs only where no reasonable person could take the view adopted by the trial court." When reviewing the trial court's decision to reject the defendant's proffered jury instructions, however, a different standard is applied, which we discuss below.

### B. The Admissibility of Evidence Concerning the Aliens' Living Conditions

The defendant initially contends that the trial court abused its discretion in admitting evidence of the illegal aliens' living conditions in violation of Fed.R.Evid. 401 and 403. Specifically, the defendant argues that the evidence was irrelevant and more prejudicial than probative. Furthermore, Fawley contends that the court's limiting instruction did not cure the error and denied the defendant his right to fair trial. The Government contends that this evidence is relevant in demonstrating that Fawley had knowledge of the aliens' living conditions; and that the alleged prejudice of the reception of such evidence is not greater than its probative value in establishing that Fawley clearly had knowledge that Klehm was employing illegal aliens.

Prior to hearing the aliens' testimony, the court gave the jury the following limiting instruction:

Now, you're going to hear testimony, jurors, about the conditions of these premises, how many people were there, what the living conditions were. This evidence is for the limited purpose, again, of whether it may or may not tend to prove knowledge on the part of Mr. Fawley, tend to prove what did he know and how much, did he know.

The defendant, in arguing against the Government's contention, asserted that "relevant evidence is defined by the relationship between the evidence and the fact at issue and must be demonstrated by reasonable inferences."

The illegal alien employees subsequently testified that the defendant had knowledge of the Mexicans' living conditions. The defendant now contends that in reaching this conclusion, the jury was required to "speculate" or to "take a leap of faith" in drawing these inferences. "To conclude that because Defendant may have been aware of the living conditions of the aliens he made false statements before the grand jury, i.e. that he had any knowledge that Klehm Nursery employed illegal aliens, would indeed require a leap of faith." We disagree.

Under Fed.R.Evid. 401, evidence is relevant when it has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added). Fawley testified that he was, in essence, Klehm's "right-hand man." As previously indicated, Fawley was deeply involved in the daily operations of the nursery, including, but not limited to, such activities as providing Klehm's workers transportation to other jobs, delivering paychecks, performing occasional maintenance at the workers' homes, and generally acting as a "go-between" for Klehm and his employees. While visiting the workers' homes, Fawley had ample opportunity on a number of occasions to observe the workers' deplorable living conditions. According to both Phillips and Robert Jamison, a furnace repairman who visited the aliens'

dwellings with Fawley, the Queensway and Redwood residences were virtually unfit for human habitation, with trash strewn about, bugs and insects scurrying everywhere, and a penetrating foul odor in the house. The sleeping accommodations were what one would expect to find in a third-world tenement, with sixteen adult men crammed into a dwelling intended for six. Rental rates were also exorbitant. The Mexicans collectively paid Klehm a total of $2,400 per month for rent at the Queensway and Redwood apartments.

Phillips also testified that he and Fawley had visited the residences together on several occasions. In early November of 1994, for example, Phillips and Fawley stopped by the Redwood dwelling. Seeing the aliens' living conditions, Phillips inquired of Fawley if the house was about to be cleaned or repaired. Phillips testified that Fawley responded that this was the way Mexicans lived and that they would not complain because they were illegal. On a later occasion at Queensway, Phillips advised Fawley that people should not have to live in such wretched conditions. Fawley once again responded that the aliens would not complain because of their illegal status.

Referring to the earlier testimony of INS Agent Merchant, who was called by the Government to discuss the relevance of the aliens' living conditions to Fawley's knowledge of Klehm's illegal activities, "you take the totality of the circumstances, the living conditions, the manner of dress, the speech ... in determining whether a person is an illegal alien." Merchant's testimony demonstrates why the defendant's knowledge of the aliens' living conditions was relevant to Fawley's overall knowledge of the legal status of Klehm's employees. Surely, Fawley's statement based upon his observations, as referred to in his testimony and that of Phillips regarding the aliens' living conditions, makes it eminently clear that Klehm's workers were illegal aliens. Contrary to the defendant's argument, this Court is of the opinion that the trial judge did not abuse his discretion in holding that the evidence of the aliens' living conditions was relevant, believing it would be helpful to the jury in determining whether

the defendant Fawley had knowledge of the illegal status of Klehm's employees.

■ The defendant also contends that the district court's admission of this evidence constituted reversible error because even if it was relevant, the prejudicial effect of its inclusion outweighed its probative value. Specifically, Fawley argues that the jury might very well have been inclined to convict him due to their outrage over the aliens' deplorable living conditions, rather than on the basis of his alleged false statements before the grand jury. The defendant argues that in determining the prejudicial effect of evidence, "the court must measure the extent to which a jury might consider evidence for purposes other than which it was intended or that a jury may decide a case based upon an improper basis, such as an emotional one, rather than on the evidence presented." *See United States v. Medina*, 755 F.2d 1269 (7th Cir.1985).

■ Under Fed.R.Evid. 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir.1986), *cert. denied*, 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986) (citation and internal quotation omitted). Under Rule 403, the district court is required "to balance the questionable relevance of the excluded testimony against the hazards of admitting that evidence." *United States v. Pulido*, 69 F.3d 192, 204 (7th Cir.1993). And "because it is a 'comparison of intangibles,' a district court's Rule 403 balancing is afforded a special degree of deference: '[o]nly in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'" *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.1991), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991)

(quoting *United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir.1989)).

Furthermore, courts often give limiting instructions to juries to confine the possible prejudicial effect of otherwise probative evidence. During Fawley's trial, the court admonished the jury on more than one occasion not to consider the evidence of the aliens' living conditions for any purpose other than whether or not it tended to establish the defendant's knowledge of the aliens' living conditions. We hold that the court's limiting instructions certainly abated any risk of prejudice that might arise from the reception of the evidence. The totality of the circumstances concerning the existence of the illegal aliens, including their living conditions, was highly probative of the issue of Fawley's knowledge, and was not outweighed by prejudice, if there was any, resulting from the admission of this evidence.

## C. The "Ostrich" Jury Instruction

■ The defendant next contends that the trial judge abused his discretion in giving the following "ostrich," or "conscious avoidance," instruction to the jury, over the defendant's objection:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used the term in these instructions.

This "ostrich" instruction, named so because of the inference that the defendant negligently "buried his head in the sand," is given in cases like this one,[2] where the defendant is prosecuted pursuant to a criminal statute requiring proof that he acted "knowingly," but he pleads a lack of knowledge as to facts and circumstances that are evident. This court has held that an "ostrich" instruction is appropriate when "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of

---

2. The "ostrich" instruction applies in this case because the crime of perjury statutorily requires the Government to prove that, while under oath,

the defendant *knowingly* made a statement that was false and material. 18 U.S.C. § 1623.

deliberate ignorance." *Caliendo*, 910 F.2d at 433.

Although the trial court has wide latitude to instruct the jury on proper statements of relevant law, jury instructions, to be effective, must treat the issues fairly and adequately. *United States v. Strickland*, 935 F.2d 822, 826 (7th Cir.1991). In determining the correctness of jury instructions, a reviewing court "must determine from looking at the charge as a whole, whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *United States v. Abdelkoui*, 19 F.3d 1178, 1182 (7th Cir.1994) (citation and internal quotation omitted).

Fawley argues that the "ostrich" instruction was improper in this case "not only because it is a perjury case," but also because the use of the " 'ostrich instruction' improperly asks the jury to determine whether [Fawley] knowingly gave a false statement [during Klehm's grand jury proceedings] to an ambiguous question based on what he 'should have known.' "

We agree with the trial judge's decision to give the "ostrich" instruction to the jury, and hold that it was not an abuse of discretion. The facts and circumstances clearly demonstrate that Fawley had knowledge of the fact that Klehm was harboring illegal aliens, that he had knowledge that a number of the aliens were using aliases, that they were living in squalor, and that Fawley, as Klehm's "right-hand-man," necessarily had knowledge as he was generally involved in Klehm's shady dealings. Four witnesses testified at trial that the defendant was aware that Klehm employed illegal aliens.[3] For example, Rivera, one of Klehm's illegal workers, testified that during a discussion with Klehm and Fawley in 1994, Fawley was told that Rivera did not have "good papers" to work legally in the United States. Fawley was told that Rivera's false immigration doc-

uments were printed under the assumed name, "Juan Fabuz." In the same vein, Torres testified that Fawley had delivered a payroll check to him nearly every weekend in 1994 and 1995, and that the checks bore an assumed name, and in spite of this, Fawley continued to address Torres by his real name. Fawley's knowledge of the *illegal* status of Klehm's employees is further evidenced by the fact that Fawley himself instructed Phillips *not to distribute paychecks to the aliens until they had paid their rent.* When Phillips questioned Fawley regarding the legality of withholding paychecks until the aliens had paid for their housing, Fawley responded that the aliens would not protest due to the fact that they were in the country illegally. Phillips testified that Fawley was aware that sixteen people were living in one of Klehm's filthy, roach-infested duplexes. When asked by Phillips why the workers were forced to live in such miserable conditions, Fawley allegedly responded that Mexicans were used to living this way and that the workers would not complain because they were illegally in the country. Finally, going to Fawley's knowledge of Klehm's employees, Fawley stated under oath that only four of the 25 employees working at the nursery with him *actually spoke English.*[4] Despite the overwhelming incriminating evidence in the record, Fawley denied any knowledge as to the fact that Klehm's Mexican employees were illegal aliens at least 15 times during his grand jury testimony.

The defendant's second argument concerning the "ostrich" instruction is that the prosecutor's use of the word "knowledge" at Klehm's grand jury proceeding was ambiguous. As such, Fawley contends that the use of the "ostrich" instruction was improper because, in effect, it asked the jury to determine whether Fawley knowingly gave false answers to ambiguous questions. The defen-

**3.** Although the trial transcript was not made part of the record, both parties stipulate to the following testimony.

**4.** We do not mean to suggest that because Klehm employed Spanish-speaking people, we thus assume that they were illegally in this country. On the contrary, considered along with the totality of the other evidence (i.e., testimony regarding

Fawley's knowledge of false immigration papers and the use of aliases on payroll checks), it is the fact that *so many* of Klehm's employees in Champaign spoke Spanish rather than English that leads us to the conclusion that a knowledgeable person should have been put on notice that these people were in all probability illegal aliens.

dant argues that before the jury in this case can determine whether Fawley knew he was committing perjury, it must first determine the defendant's understanding of the words "any knowledge," as used by the prosecutor in questioning Fawley during Klehm's grand jury.

Initially, it is surprising that Fawley, a graduate of the University of Illinois, would make this ludicrous argument that the meaning of the common term "knowledge" was ambiguous to him. The word "knowledge" is in common English usage and is understood by the average U.S. citizen. Fawley's direct and clear responses to the questions proposed to him during the grand jury proceeding suggest he understood them. In fact, Fawley was asked several times if he had any knowledge that Klehm's employees were illegal aliens; he answered in unequivocal language "no" each time. Fawley never said during the grand jury proceeding that he did not understand the use of the term "knowledge." We agree with the Third Circuit's holding in *United States v. Reilly:* "we do not believe that in the context of the questions, the term 'knowledge,' without further definition is inherently ambiguous." 33 F.3d 1396, 1415 (3d Cir.1994). Contrary to the defendant's claims, we hold that the wording of the prosecutor's questions was clear and unambiguous, was not subject to various meanings, and did not constitute a basis to defeat the "ostrich" instruction.[5]

Fawley also has failed to provide legal authority in support of his argument that the "ostrich" instruction is inappropriate in a perjury case. As the Government notes, the use of the "ostrich" instruction was upheld by this Court in a prosecution of a charge of conspiracy to commit wire and bank fraud in *United States v. Strickland,* where we held that "knowingly" was the "operative mental state in both the bank fraud and wire fraud statutes." 935 F.2d at 826. "Knowingly" is operative in the perjury statute as well. In our opinion, the district judge did not abuse his discretion in giving the jury an "ostrich" instruction during the defendant's perjury trial.

5. To support his argument, Fawley cites a 15 page dissenting opinion in a 1972 case from the

### D. The Denial of the Defendant's Proffered Jury Instructions

The defendant next contends that the trial court erred in refusing to give to the jury the defendant's tendered instructions: (1) regarding the use of the term "knowledge" in the "ostrich" instruction and grand jury proceedings; and (2) informing the jury that a unanimous verdict had to be reached regarding each of the defendant's statements in the indictment in order for Fawley to be found guilty of perjury. Our task in reviewing the propriety of jury instructions to which objections were properly raised during the trial court's proceedings is to "determine from the charge as a whole, 'whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues ...'" *United States v. Boykins,* 9 F.3d 1278, 1285 (7th Cir.1993) (quoting *Trustees of Indiana Univ. v. Aetna Casualty and Sur. Co.,* 920 F.2d 429, 437 (7th Cir.1990), overruled on other grounds by *Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 278 (7th Cir.1994)). Generally, instructions which are accurate statements of the law and are supported in the record will not be disturbed on appeal. *Boykins,* 9 F.3d at 1285. A court's failure to give a proffered instruction is considered relative to a different test:

> A defendant is *entitled* to an instruction on a theory of defense [ ] if: (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial.

*United States v. Edwards,* 36 F.3d 639, 645 (7th Cir.1994) (emphasis added). If the trial court fails to give the jury a tendered instruction that satisfies all four criteria, the trial court's decision not to give the instruction will provide grounds for reversal. *Id.* at 645–46.

9th Circuit. *United States v. Cook,* 497 F.2d 753 (9th Cir.1972).

### 1. Defendant's "Knowledge" Instruction

█ In the instant case, the Government proffered the following instruction concerning the use of the term "knowingly":

> When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident. To act knowingly does not mean that a defendant had to realize he was violating the law. Knowledge may be proved by the defendant's conduct and by all of the facts and circumstances surrounding the case.

The court, in instructing the jury, immediately followed this statement of the law of the word knowledge with the "ostrich" instruction quoted above. The defendant asked the trial judge to also supply the jury with an instruction regarding Fawley's knowledge which provided:

> You have been given the court's instruction on the definition of the word "knowledge." This instruction is not to be used to determine the defendant's understanding of the word "knowledge" or "know" as used by the prosecutor in the grand jury proceeding.

In providing this instruction, the defendant raised the same argument that he used to attack the "ostrich" instruction: that the prosecutor's use of the term "knowledge" in Klehm's grand jury proceeding was ambiguous. Thus, we hold that this argument must be rejected here in the same way that it was rejected when we considered the propriety of the "ostrich" instruction.

The trial judge rejected Fawley's "knowledge" instruction and stated: "Defendant's Instruction 5 is refused. It is a misstatement of the law, *United States v. Watson* ... It's an instruction to tell the jury to ignore the court's instructions on knowledge...."

The district court's ruling was based on a strikingly similar fact situation faced in *United States v. Watson*, 623 F.2d 1198 (7th Cir.1980). In *Watson*, the defendant was convicted of perjury pursuant to 18 U.S.C. § 1623. The defendant appealed the district

court's refusal to give the following instruction regarding "knowledge":

> To establish intent in the case the government must prove that the defendant deliberately and purposely violated his oath to tell the truth by testifying to the truth of a fact which defendant did not believe to be true. Such intent may be determined from all the facts and circumstances surrounding the case. An act is "knowingly" done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

*Id.* at 1206. The district court's rejection was based on the fact that the jury had been instructed during trial on the definition of the term "knowingly":

> The term "knowingly" in these instructions, means to do an act voluntarily and intentionally and not because of mistake or accident or other innocent reason.

*Id.* This Court, in upholding the district court's ruling, held:

> Obviously, the second paragraph of this requested instruction is repetitious of the court's charge on the definition of knowledge. To the extent that the first paragraph requires proof of a mental state different than that characterized by "knowledge," we believe the request represents a misstatement of the law.

*Id.*

In evaluating the propriety of the district court's refusal to proffer the defendant's jury instruction regarding "knowledge," we also consider the *Edwards* standards. We reject Fawley's "knowledge" instruction because it does not represent an accurate statement of the law. In *Watson*, this Court affirmed the district judge's jury instruction that defined "knowingly" to mean "to do an act voluntarily and intentionally and not because of mistake or accident or other innocent reason." *Id.* This language is identical to the instruction given in the instant case. We likewise hold, in comport with the second *Edwards* element, that the defendant's "knowledge" instruction does not reflect a theory that is supported by the evidence. As addressed in our discussion of the "ostrich" instruction above, Fawley failed to adduce convincing evidence in support of his contention that

either he or the jury would be confused by the use of the common term "knowledge." We also hold, under the third and fourth *Edwards* criteria, that the defendant's "knowledge" instruction was part of a theory that was, in fact, already part of the charge, and that the denial of the instruction did not deny Fawley a fair trial. Fawley offers less than meritorious evidence to support either of these claims.

### 2. Defendant's Unanimity Instruction

■ The defendant also argues that the district court erred in failing to give the defendant's tendered instruction informing the jury that a unanimous verdict must be reached as to the truth of each of the defendant's statements contained in the indictment. As previously stated, the defendant's indictment charged him with giving two individual statements alleged to be false. To aid the jury in their determination of the truthfulness of the defendant's answers to the prosecutor's questions, the defendant offered the following instruction:

> Count I contains answers given by the defendant reciting more than one fact. It is not necessary that the government prove that each of these factual statements is false. The government satisfies its burden of proving falsity if it proves beyond a reasonable doubt that any of the factual statements recited in Count I is false. However, and this is important, *you must not find the defendant guilty unless you all agree, unanimously, that one particular answer is false. It is not enough that you all believe that some answer given by the defendant is false. That is, you cannot find the defendant guilty if some of you think that only answer A is false and the rest of you think that only answer B is false. There must be at least one specific answer that all of you believe is false in order to convict the defendant.*

(emphasis added). The district court rejected Fawley's proffered instruction, and instead provided its own, to wit:

> To prove the charge of false declarations before a United States grand jury as charged in the indictment, the government must prove each of the following proposi-

tions beyond a reasonable doubt: First, that the defendant while under oath testified falsely before a United States grand jury.... Note that with regard to the first proposition to convict you must unanimously agree that at least one of the answers given by the defendant as charged in the indictment was false.

The language set forth in the defendant's instruction is more clear and definitive in providing: "[the jury] cannot find the defendant guilty if some of you think that only answer A is false and the rest of you think that only answer B is false. There must be at least one specific answer that all of you believe is false in order to convict the defendant." The Government's instruction, on the other hand, is confusing and might have allowed jurors to convict Fawley despite the fact that all 12 did not reach a unanimous verdict regarding which specific question Fawley answered falsely. In short, the wording of the given instruction was not clear and the jury should have been advised that in order to have convicted Fawley, they had to unanimously agree that a particular statement contained in the indictment was falsely made. As such, the trial court's jury instruction violates the defendant's right to a unanimous jury verdict, pursuant to Rule 31(a) of the Federal Rules of Criminal Procedure, which dictates that "[t]he verdict shall be unanimous." This rule gives explicit recognition to a requirement that the Supreme Court has long assumed to inhere in a federal criminal defendant's due process right to a unanimous verdict. In *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948), the Court held that "[u]nanimity in jury verdicts is required where the Sixth and Seventh Amendments apply.... A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it." *See Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972).

The dictates of the Supreme Court's reasoning were recently applied in two cases with facts similar to those in the instant case. In *United States v. Holley*, 942 F.2d 916, 929

(5th Cir.1991), *cert. denied,* 510 U.S. 821, 114 S.Ct. 77, 126 L.Ed.2d 45 (1993), the Fifth Circuit held, as in the case under consideration, that the trial judge's failure to give a specific unanimity instruction was reversible error in a perjury prosecution which alleged multiple false statements. In so doing, the court noted:

> [B]oth counts of [the defendant's] indictment allege multiple false statements. The government was required to prove dissimilar facts to show the knowing falsity of each statement.... The most reasonable interpretation of the court's instruction ... is that each juror was individually required to find at least one statement in each count to have been knowingly false in order to find Holley guilty. The instruction does not, however, require that all of the jurors concur in the knowing falsity of at least one particular statement.

*Id.* at 928–29; *see also United States v. Duncan,* 850 F.2d 1104, 1110–13 (5th Cir. 1988) (jury in tax case where defendants were charged with two false statements had to agree unanimously on the falsity of one of the statements because statements were conceptually distinct).

The line of reasoning set forth in *Holley* and its progeny was based on the Fifth Circuit's seminal opinion in *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977). In *Gipson,* the court held that an instruction that authorized the defendant's conviction if the jurors were satisfied that the defendant had performed any of six acts prohibited by a statute in question violated the defendant's constitutional right to a unanimous verdict. The court stated:

> The district court's challenged instruction authorized the jury to return a guilty verdict despite the fact that some jurors may have believed that Gipson engaged in conduct only characterizable as receiving, concealing, or storing while other jurors were convinced that he committed acts only constituting bartering, selling or disposing. Thus, under the instruction, the jury was permitted to convict Gipson even though there may have been significant disagreement among the jurors as to what he did.

The instruction was therefore violative of Gipson's right to unanimous jury verdict.

*Id.* at 458–59. The court went on to note that such an instruction was not harmless error and reversed the district court. *Id.* at 459.

We agree with the conclusions reached in *Holley* and *Gipson.* In our case, the trial court's instruction left the jury free to render a guilty verdict in a perjury case without reaching a unanimous verdict. Interestingly, in considering the trial court's instruction, it is the Government who acknowledges the weakness of the trial court's language:

> If the district court had not added the clarification beginning with "Note," [in the jury instruction,] then Fawley's argument based upon *Gipson* would have merit. Without the clarification, Fawley could have been convicted of making a false declaration without the jury ever unanimously agreeing that one particular false statement was made. If 10 jurors thought Fawley's denial of any knowledge of the existence of illegal aliens was false, and two jurors believed that the statement concerning Fawley telling the Mexicans to leave the country was false, there would not be a unanimous verdict under the district court's instructions given in Fawley's case because the jurors did not unanimously agree that at least one of the answers was false. Under the given instruction, Fawley could only be convicted if all 12 jurors unanimously agreed that at least one of the statements was false.

The Government seems to have the right idea, but reaches the wrong conclusion, and ironically makes a strong argument against its own position. In our opinion, the trial court's instruction is not only ineffective because it did not require that all of the jurors unanimously concur in the knowing falsity of at least one particular statement made by Fawley, but it is also misleading, and in the process, eviscerates the defendant's due process right to a unanimous verdict. We are of the opinion that the given instruction was in error, and we hold that the error was compelling enough to warrant a reversal of the defendant's conviction. *See Chapman v. Cal-*

*ifornia,* 386 U.S. 18, 25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ We next consider the defendant's proffered jury unanimity instruction, which we will once again examine in light of the *Edwards* standards. If a trial court fails to give a tendered instruction that satisfies the *Edwards* criteria, the court's decision not to give the instruction will provide grounds for reversal. *Edwards,* 36 F.3d at 645–46. We are of the opinion that Fawley's instruction was an accurate statement of the law. Fawley's instruction properly advised the jury that it must not find the defendant guilty unless each member of the jury "agree[s], unanimously, that one particular answer is false." Such an instruction properly reflects the law as dictated by the Supreme Court in *Andres,* as well as in Rule 31(a) of the Federal Rules of Criminal Procedure.

Secondly, we hold that Fawley's instruction reflects a theory that is supported in the evidence. Case law is clear that a unanimous jury verdict is essential for conviction in any criminal case, whether it be federal or state.

We are also of the opinion that Fawley's jury unanimity instruction was proper because it reflects a theory which is not already part of the charge. In order to find a given defendant guilty of perjury, the jury must unanimously agree that a particular material statement was false. Fawley's proposed unanimity instruction properly required that the 12 jurors unanimously concur that a particular material statement was falsely made.

Finally, we hold that the trial court denied Fawley a fair trial by violating his due process rights in giving an ambiguous and/or confusing jury instruction. As stated by the Supreme Court in *Andres,* the defendant had a right to a unanimous verdict, and that right was neglected here. In sum, we hold that the trial court committed reversible error in giving a jury instruction that was misleading, ineffective, and denied the defendant his due process rights.

### E. The Questioning of Klehm Regarding His Prior Conviction

■ The defendant's fourth and final contention is that the district court erred in allowing the Government to question Klehm in detail regarding his prior conviction for harboring illegal aliens. The defendant's lawyers asked Klehm to testify on Fawley's behalf. Upon being questioned on direct examination whether he had been convicted of a felony in 1996, Klehm responded that he had. After the conclusion of direct examination, the district court gave a limiting instruction advising the jury that the evidence of Klehm's conviction only went to the issue of Klehm's credibility and was not to be used as evidence against Fawley. During cross-examination, the Government sought to question Klehm in more detail concerning the nature of his conviction. Over Fawley's objection, on cross-examination Klehm revealed for the first time that he had been convicted of harboring and employing illegal aliens at his nursery in Champaign, as well as the date of his conviction and the names of the aliens he had harbored (who also happened to be witnesses in Fawley's perjury trial).

The defendant argues that the district court abused its discretion in permitting Klehm to testify regarding the identity of the illegal aliens listed in Klehm's indictment. In eliciting the names of the aliens, the defendant claims that the Government was allowed to unfairly delve into the details of Klehm's earlier conviction and bolster the credibility of these individuals, who also happened to be witnesses at Fawley's trial. That is, the jury could have concluded that because Klehm was ultimately convicted, the testimony given by the aliens at Fawley's trial was truthful. Neither party denies the fact that the aliens figured prominently in Klehm's conviction for harboring illegal aliens; the defendant argues that a danger existed that the jury concluded that Fawley was guilty of harboring illegal aliens, and not of perjury.

This Court has previously held that, during trial, when questions asked on direct examination of a witness concerning prior crimes have been perfunctory in nature, a prosecutor is entitled to amplify them. *United States v. Fountain,* 768 F.2d 790, 795 (7th Cir.1985), *modified,* 777 F.2d 345 (7th Cir. 1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). In *Fountain,* a

co-defendant on direct examination was asked simply whether he had previously been convicted of several crimes, including the murder of a prison guard. *Id.* Although the defendant initially answered this question in the affirmative, on cross-examination, the prosecutor then "amplified" the question, asking for more details about the killing (i.e., when and where it had taken place). This Court held that the prosecutor on cross-examination was permitted to "amplify" the perfunctory question asked on direct examination by the defendant's attorney. *Id.* The mere "amplification" was permissible since the prejudice of including evidence of the defendant's prior felony was outweighed by its probative value, despite the prosecutor's "amplification." *Id.* Although there are differences between the facts in *Fountain* and those in our case (most notably, the witness being subjected to cross-examination, Klehm, is not the defendant, as was the case in *Fountain*), we nonetheless find the result in *Fountain* instructive. Under Fed.R.Evid. 609(a)(1), *defendants* under cross-examination may be questioned regarding a prior felony only "if the court determines that the probative value of admitting this evidence *outweighs* its prejudicial effect . . . ." (emphasis added).

On the other hand, Fed.R.Evid. 609(a)(1) affords a prosecutor wider latitude to impeach a witness, like Klehm, who is not the accused. Rule 609(a)(1) makes it more difficult in the impeachment of a defense witness to exclude evidence of a prior felony. This is due to the fact that the prejudice of evidence of a prior felony *merely needs to outweigh* the probative value of such evidence when the accused is on the witness stand. For a defense witness who is not the accused, however, prejudice must *substantially outweigh* the probative value for the felony evidence to be excluded. In our case, the defendant's lawyers asked Klehm to testify on Fawley's behalf. During direct examination, Klehm admitted that he had been convicted of a felony. The prosecutor in Fawley's case, acting pursuant to Rule 609(a)(1), then properly asked Klehm, for purposes of impeachment, the nature of his felony conviction and when it took place. This Court has previously held that a prosecutor's questions on

cross-examination must be limited to only whether the witness "had previously been convicted of a felony, to what the felony was and to when the conviction was obtained." *United States v. Dow,* 457 F.2d 246, 250 (7th Cir.1972) (citation omitted). In asking Klehm for the nature and date of the conviction, the prosecutor was merely "amplifying" the perfunctory nature of the question asked during direct examination, similar to the exercise in *Fountain.* We hold that a limited amplification certainly avoids the risk of *substantial* prejudice addressed in Rule 609(a)(1) because, as discussed above, Klehm was not the defendant in this case. The avoidance of prejudice was further safeguarded as the Government refrained from addressing Klehm's conviction after eliciting this information. Additionally, the district court specifically cautioned the jury:

> Evidence of a prior conviction of a felony is admissible on the question of credibility as it may or may not in your deliberations affect your judgment of the credibility of the witness. The fact that a witness has been convicted of a felony is proper for you to consider in weighing the witness's credibility. But the fact that the witness has been convicted of a felony isn't evidence against Mr. Fawley on the issues in this case. The evidence of conviction of a felony only relates to Mr. Klehm's credibility.

On the other hand, the defendant argues that by eliciting the names of the illegal aliens in Klehm's harboring counts, the prosecutor was permitted to unfairly delve into the details of Klehm's earlier conviction. In support of his theory, the defendant relies on *United States v. Robinson,* 8 F.3d 398, 399 (7th Cir.1993), a case wherein the defendant was charged with mail, wire and tax fraud. The defendant testified on direct examination that he had previously been convicted of being an accessory after the fact to the crime of attempted murder. During cross-examination, the prosecutor asked Robinson questions concerning the identity of the intended victim of the attempted murder. *Id.* at 408–09. On appeal, Robinson argued that the cross-examination was improper because the prosecutor "impermissibly delved into the details of prior conviction, thus violating Federal Rule of Evidence 609." *Id.* at 407. This Court noted

that "[t]he examination must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained." *Id.* at 409 (citing *Dow,* 457 F.2d at 250).

However, in relying on *Robinson,* the defendant fails to give a complete characterization of the case. In *Robinson,* this Court went on to hold that the prejudice from the prosecutor's improper questioning of the defendant Robinson regarding his prior conviction was harmless and did not deprive the defendant of a fair trial. *Id.* at 411. This was due to the fact that: (1) evidence of the defendant's guilt was overwhelming; (2) the district judge had told the jury to disregard the improper questions and answers; (3) the prosecutor did not refer to the prior conviction again during the trial; and (4) the improper material amounted to a minuscule three pages in a trial transcript exceeding 2,400 pages. *Id.* We likewise hold that the prejudice resulting from the prosecutor's questioning of Klehm was harmless.

## IV. CONCLUSION

Although we agree with the vast majority of the trial judge's rulings, we are forced to disagree with his instruction dealing with the requirement that the jury reach a unanimous verdict, and order a reversal and remand for a new trial.

REVERSED.