NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 3, 2007
Decided June 7, 2007

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 06-3079

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Eastern District of Wisconsin. |
| *v.* | No. 05 CR 253 |
| TRACY PETERS, | William C. Griesbach, |
| *Defendant-Appellant.* | *Judge.* |

**O R D E R**

Tracy A. Peters was indicted for second degree murder. A jury found him guilty at the conclusion of a 3-day trial and Judge William C. Griesbach sentenced him to a term of 324 months in prison. Peters appeals, arguing that Judge Griesbach abused his discretion by restricting the cross-examination concerning a key witness's mental health history and by refusing to admit into evidence the witness's prior convictions. We start with the facts.

In the early morning hours of September 17, 2005, Peters stabbed Sean Grignon to death during a brawl in a residential area of the Menominee Indian Reservation known as Middle Village. Many people converged on a trailer owned by Maniyan Brisk on the night of September 16. Everyone had been drinking heavily.

A minor dispute between family members about a borrowed car and broken windshield mushroomed into a full-fledged melee, involving insults, attacks with "40s" (40-ounce bottles of beer), and physical beatings. The fight had its own ebb and flow as the night went on, and there were several breaks in the action. Once the dust settled, Grignon was found on the next-door neighbor's porch, dead of a single stab wound to the heart. When the police arrived, Peters announced he'd stabbed Grignon, but he insisted that he acted in self-defense.

Let's meet the cast of characters that found themselves at Maniyan's trailer that night. Maniyan, Doreen Diaz, Manuel Cortez, Aurelio Flores, and Maniyan's young child drove to the reservation from Milwaukee on the morning of September 16. All the adults drank during the trip. Maniyan and Diaz are sisters and Menominee tribal descendants who live in Milwaukee, but Maniyan also owns a trailer in Middle Village that she bought from Peters a few years earlier. Their mother, Valerie Brisk, and their grandmother Delia Brisk, live together in Keshena, another town on the reservation.[1] Diaz and Flores were dating at the time, and Flores and Cortez were friends and former coworkers.

The group spent some time at Valerie's place drinking beer before taking her with them to Maniyan's trailer. They arrived in the afternoon and continued drinking. Maniyan fell asleep about an hour later, and when she awoke late that evening, she realized that Diaz, Flores, and Valerie had taken her car. Diaz borrowed it to drive an intoxicated and unruly Valerie home.

Meanwhile, Peters was walking on the highway near Keshena, hoping to find someplace with a VCR so he could watch a movie he had with him. He went to his mother's house and knocked on the door but no one answered, so he started heading home. As he walked past Valerie's place he heard Destinee Lyons call out to him. Lyons and Peters were friends who had known each other most of their lives. She asked him if he would come with her to buy beer. Shortly thereafter, Diaz, Flores, and Valerie pulled up in Maniyan's car.

They all sat around drinking until Valerie damaged Maniyan's windshield with a rock. Diaz and Valerie started fighting, which prompted her, Flores, Lyons, and Peters to leave Valerie at her house and head for Maniyan's. Lyons and Peters set themselves up inside the trailer to watch the movie while the sisters fought

---

[1] Maniyan Brisk, Valerie Brisk, Maniyan's mother, and Delia Brisk, Maniyan's grandmother, will be referred to by their first names to avoid confusion.

about the damage to Maniyan's car. The argument spilled outside to the porch and front yard.

That same night, Grignon was hanging out and drinking 40s at an apartment in Middle Village not far from Maniyan's trailer. He and two companions, Richard Boivin and Marshall Tourtillot, left the apartment carrying their beer bottles and began walking the streets, coincidently heading towards Maniyan's place. The three companions overheard Maniyan fighting with her sister and, attracted by the commotion, came into the yard. Cortez and Flores were with Maniyan and Diaz on the porch. Maniyan did not recognize Grignon, Boivin, or Tourtillot and wanted them off her property. But the young men refused to leave, and one of them started shouting insults.

At this point, the witnesses' accounts diverge as to how the fight started and played out. The government called just shy of 30 witnesses during its case-in-chief. Several of them testified that Grignon was acting, at least for part of the fight, as a peacemaker. Maniyan testified that she was not sure how the fight started, but she was sure that Grignon (whom she had never met before) tried to calm his other two friends down. She said that as Grignon was trying to stop the fight, Cortez struck him, causing him to join the fray. Cortez did not see Grignon, Boivin, or Tourtillot with a knife.[2] Although he and Flores did take knives from Maniyan's kitchen for self-defense, they did not stab anyone, and neither of them saw anyone get stabbed during the incident.

Diaz testified that four males[3] she did not recognize came walking down the street, one of them struck Flores in the head with a beer bottle, and a fight erupted. She testified that she never considered someone would get a knife and stab someone, and she did not see Peters stab Grignon.

According to Boivin, a fight broke out between his group and Flores, Cortez, Peters, Diaz, and Maniyan. Boivin testified that his friend Grignon was involved in the brawl and that there were "40s flying everywhere." Tourtillot agreed that Grignon participated, but first tried to calm his friends down by telling them to

---

[2] Cortez and Flores could not be located before trial, so their statements were read into the record.

[3] Diaz and some other witnesses referred to four attackers. This may be because a fourth young man, Stephen Crow, returned with Tourtillot and Boivin to Maniyan's trailer after they learned of Grignon's stabbing.

behave.  In the middle of the fight, Grignon "just took off running" to a neighbor's home.

Peters did not testify at trial, but his statements to law enforcement were introduced.  Peters recalled that he and Lyons stayed inside Maniyan's trailer while the spat between the sisters got louder and the young men arrived.

Lyons urged Peters to go outside but he refused, since it wasn't his fight.  She called him a "chicken" for not getting involved and persuaded him to come out to the porch.

Then Lyons pushed him off the front porch into the melee, where he was badly beaten (he recalled, for one thing, being struck in the throat with a club).  Peters claimed clubs and beer bottles were used during the fight and that nine armed boys and four girls eventually arrived to join the fray.  According to him, no one acted as a peacemaker.  Peters was unable (or unwilling) to explain his altercation with Grignon, how he ended up with a knife in his hands, or why he stabbed Grignon (beyond the conclusory statement that it was self-defense).

In fact, only one person testified to seeing Peters stab Grignon, and that was Destinee Lyons.  According to her, she and Grignon, tired of trying to get their friends to stop fighting, walked to the sidewalk, away from the fight, and started sharing a beer.  Lyons was facing away from the trailer and Grignon was facing towards it.

As the pair talked, Peters suddenly came from behind Lyons and lunged at Grignon's chest.  Grignon dropped the beer bottle, breaking it on the sidewalk, and ran toward the next-door neighbor's porch.  Lyons did not immediately know what happened.  She pushed Peters and said "what the f*** are you doing?"  Lyons then saw that he had a knife.

She ran after Grignon and found him bloody and motionless on the neighbor's porch.  She realized he had been stabbed and unsuccessfully tried to get someone to call 911.  Lyons ultimately left Middle Village with Maniyan to call the police from Delia's home (none of the land lines or cell phones on the property were working).  During her first call to the police, Lyons denied seeing the stabbing in order to protect Peters.  She later called back to turn Peters in.[4]

---

[4]  Peters also phoned 911 and requested that police come to the trailer but did not request an ambulance or admit to the stabbing.

Menominee Tribal Police Officers Tasha Dixon and Richard Irving arrived at Maniyan's trailer at approximately 2:38 a.m. Irving began to secure the scene when Peters walked up and admitted to the stabbing. Officers took Peters to the station, photographed his injuries (bruises and cuts) and collected his clothing. His jean shorts had blood and cut marks inside the front right pocket.

Grignon was transported to the Shawano Medical Center and pronounced dead without ever regaining consciousness. An autopsy later showed that he bled to death from a single stab wound from a knife blade that entered his chest, traveled completely through his heart, lacerated his aorta, and lodged in his spine. The total wound depth was about 6 inches. Law enforcement later found a blood-stained knife with a 6-inch blade in Maniyan's kitchen. It was stipulated at trial that blood stains on the blade of the knife and inside Peters' shorts were a match for Grignon's DNA.

Now to the issues on appeal. Peters argues that Judge Griesbach erred when he restricted the cross-examination of Lyons' mental health history and refused to admit her prior convictions. We review evidentiary rulings for abuse of discretion. The error must have a substantial effect on the defendant's rights to warrant reversal. Federal Rule of Evidence 103; United States v. Smith, 230 F.3d 300, 307 (7th Cir. 2000); United States v. Kuzlik, 468 F.3d 972, 974 (7th Cir. 2006).

As for Peters' first complaint, Judge Griesbach correctly excluded the evidence. At trial, Peters was able to elicit quite a bit of information about Lyons' mental health problems. For example, Peters' counsel asked Lyons if she was drinking alcohol at the time of the stabbing; she said she was. Counsel then asked if she was on medication at the time of the stabbing; Lyons replied that she was not. Next, he delved into her mental health history:

Q    Have you ever told anyone that you have heard voices in your head or have hallucinated?
A    Yes a long time ago after I lost my son.
Q    All right. So did you have trouble with hearing voices, correct?
A    Yes.
Q    All right. And those were controlled with medication, correct?
A    Yes.
Q    And you also were hallucinating, correct?
A    Yes.
Q    And you were also advised not to drink, correct.

A    Yes.

Q    All right.

A    While on medication.  And I went through my treatment
     at Winnebago 10 months, Brown County three times, and
     I'm done.

Q    But you're not done drinking?

A    No.

Q    Okay.  That's the important thing, that you're not done
     drinking, correct?
            Mr. Funnell:  Objection.  Asked and
            answered.
            The Court:  The objection is sustained.  It's
            argumentative.

Q    So you were in the Winnebago mental health facility for
     ten months, you said?
            Mr. Funnell:  Judge, could I have a sidebar, please?
            The Court:  Yes.

The judge asked what else Peters intended to cover.  Referring to the hospital stays, Peters' counsel responded:  "The reports that I believe she's familiar with and will acknowledge are reports that were generated indicating that she has a schizoaffective disorder, that she has manipulative behaviors, she describes voices originating inside and outside of her head, and her hallucinating experiences."  He conceded, "Not really much more than we've had already--very, very little more.  When she said she was in those places, I thought I'd just follow up on it.  I'm pretty satisfied that the jury understands.  I mean, very little more."  The government objected unless Peters was able to link further questions to Lyons' ability to perceive and describe the stabbing.

Obviously, the opportunity to challenge the credibility of a key witness on cross-examination is vital to a defendant's case.  Giglio v. United States, 405 U.S. 150, 154 (1972).  But the scope of that cross-examination is not unlimited.  Fed. R. Evid. 401.

Peters cites several cases from other circuits to support the argument that Judge Griesbach should have allowed additional testimony about Lyons' mental health.  These cases simply stand for the unremarkable proposition that a jury should know about any mental health issues that would compromise a witness's ability to perceive and recall events at the time the crime occurred.  See, e.g., United States v. Partin, 493 F.2d 750, 762 (5th Cir. 1974) ("It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an

impairment of sight or hearing.") (emphasis added); <u>United States v. Butt</u>, 955 F.2d 77, 82 (1st Cir. 1992). And Judge Griesbach made it quite clear he did not intend to exclude that kind of evidence (emphasis added):

> In fact, we have enough on mental health. If there's something that-- I'm satisfied what the jury has already heard is more than adequate. We are not going to go into her diagnosis or that sort of thing. <u>If there's something that actually links any mental illness to her observations in this particular case on this event on the 17th or something like that, that would be something different.</u> But to go back three, four years to someone's mental history and then use it in this fashion I think is inappropriate.
>
>      . . . .
>
> I want to make it clear that there is no and should be no dispute that if there's evidence that this witness has a chronic condition which interferes with her ability to perceive, to accurately recall events, to have contact with reality, that's fair game for impeachment or challenging credibility.
>
>    On the other hand, bringing up a mental health record saying you were institutionalized or you were committed for a period of time without any relation to ability to perceive and relating of that seems to me unfair and prejudicial. <u>And if there is evidence that the defense has that directly relates to this witness's ability to accurately perceive and report, my ruling is not intended to prevent delving into that area.</u>
>
>     And, Mr. Burke, is there such evidence?

Peters' counsel responded that he had "as much out of that line of cross-examination that I might need." He said that he "may go back and look at it again given the Court's invitation if I have anything specific, but right now I don't. And I

don't intend to go there."[5]  Despite this previous posture, Peters now argues that Judge Griesbach's failure to permit questions about reports that Lyons had been diagnosed with schizoaffective disorder and manipulative behavior, that she heard voices and hallucinated, and that she was an alcoholic significantly harmed his case.  We address each in turn.

Further evidence about the hospital reports was properly excluded.  United States v. Sutton, 337 F.3d 792, 798 (7th Cir. 2003).  Lyons testified about "voices and hallucinations" on cross-examination.  As for being an alcoholic, the judge allowed Peters to ask Lyons what she drank on the day of the stabbing and whether that affected her perception.  But he appropriately drew the line at alcohol dependency because it amounted to character evidence under Federal Rule of Evidence 404(a).  United States v. Neely, 980 F.2d 1074, 1081 (7th Cir. 1992); United States v. Robinson, 956 F.2d 1388, 1398 (7th Cir. 1992).

Peters also had material about which to impeach Lyons.  She lied to the dispatcher about not witnessing the stabbing in her first 911 call; she was "buzzed" by her alcohol consumption; there were differences between her version of events and those of other witnesses (the most glaring being, of course, that she was the only one who witnessed the stabbing); and her mental health history included hallucinations, hearing voices, medication, and the need for three inpatient treatment sessions.  All of this gave the jury more than enough information upon which to consider Lyons' credibility as a witness.

But Peters also complains that the judge improperly excluded Lyons' prior convictions under Rule 609, which states:

> (a)  **General rule**.--For the purpose of attacking the character for truthfulness of a witness,
>     (1)  evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year . . . and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value

---

[5]  These statements also call into question whether Peters satisfied Federal Rule of Evidence 103's requirement that a party make an adequate proffer of evidence in the trial court in order to claim the exclusion of that evidence caused harm.

> of admitting this evidence outweighs its prejudicial effect
> to the accused[.]

Prior to the start of the trial, Peters won a significant victory when Judge Griesbach ruled that the government would not be allowed to introduce his criminal record for impeachment purposes if he took the stand in his own defense. As it turned out, however, Peters elected not to testify so the ruling did him no good. But Judge Griesbach also, in an effort to afford equal treatment to the government, prohibited Peters from going into Lyons' criminal record on cross-examination. This was, we think, an error. Because Lyons was a key witness in this case, an inquiry on cross-examination into her criminal record should have been fair game. The effort to be even-handed and treat Lyons the same way Peters was treated on the issue of a prior record was misguided.

Except for crimes involving dishonesty or false statements (Rule 609(a)(2)), a district court must engage in a balancing test when deciding whether to admit prior convictions. The standards for witnesses and defendants are not identical (although each requires that convictions carry a sentence of more than one year and be less than ten years old). To admit a defendant's conviction, its probative value must outweigh its prejudicial effect. Rule 609; United States v. Fawley, 137 F.3d 458, 473 (7th Cir. 1998). For a witness, a prior conviction comes in if its probative value is not substantially outweighed by the danger of unfair prejudice. Rules 403 and 609.

In other words, it's easier for parties to impeach witnesses with prior convictions than defendants. Rule 609(a)(1); Fawley, at 473. This makes sense. A jury hearing about a defendant's prior conviction is more likely to misuse it as character evidence. Fed. R. Evid. 609 advisory committee notes; Fawley, at 473.

However, the error here was harmless. As we have already explained, Lyons had a lot of warts as a witness. And although she was an important part of the government's case, other evidence strongly indicated that Peters did not act in self-defense.

The stabbing itself suggests malice aforethought--a willful or intentional act taken with a wanton and callous disregard for human life. United States v. Hillsberg, 812 F.2d 328, 332 (7th Cir. 1987). Grignon was killed by one deep stab wound that traveled through his heart and lodged in his spine. The blade of the knife traveled 6 inches into his chest. He suffered no superficial cuts or slashes as if someone he was attacking was trying to defend himself.

There was no evidence that other men in the thick of the melee stabbed anyone. Grignon was younger, slender, and there was much testimony that he was a "peacemaker," at least initially--even from friends of Peters who had not met Grignon before that night (for example, Maniyan Brisk). Peters' minor injuries (various bruises and cuts) discredited his claim that lethal self-defense was necessary. In fact, Peters' neck--where he claimed he was hit in the throat with a club--showed no bruising at all. Peters chose not to take the stand in his own defense, and so the jury heard nothing about how he got a knife or why he used it to stab Grignon only once, through the heart. Given this state of affairs, we cannot conclude that keeping Lyons' criminal record out of evidence was prejudicial error.

The judgment of the district court is AFFIRMED.