UNITED STATES of America,
Plaintiff-Appellee,

v.

Otis L. McCLELLAN and John
D. Sargent, Defendants–
Appellants.

Nos. 97–3370, 97–3371.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1998.

Decided Jan. 4, 1999.

**538**

Judith A. Stewart, Joshua J. Minkler (argued), Office of U.S. Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Patrick Stern (argued), Indianapolis, IN, for Defendant–Appellant.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The defendants-appellants, Otis McClellan and John Sargent, appeal from their convictions for conspiring to possess marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiracy to commit money laundering, contrary to 18 U.S.C. § 1956(a)(1)(A)(i) and (h). Sargent alone appeals his sentence. We affirm.

## I. BACKGROUND

### A. The Marijuana Trafficking Conspiracy

The co-defendant, Otis McClellan ("McClellan"), befriended Donna Brewer ("Donna") in May of 1995 while the two were living in Tucson, Arizona. About one month later, Donna introduced McClellan to her two sisters, Judy ("Judy") and Pamela Brewer ("Pam"). McClellan and Judy, who also resided in Tucson, became friends shortly thereafter. In fact, they became such good friends that he loaned her nearly $1,000 to secure an apartment after she moved back to her hometown of Anderson, Indiana, in September of 1995.

For the first two weeks she was in Anderson, Judy lived with her stepfather, Jerry Irwin ("Irwin"), and during this period of time, she had an opportunity to observe Irwin selling marijuana out of his home. When Judy asked him who his drug source was, Irwin responded that McClellan and Donna had brought it in from Arizona. Shortly thereafter, McClellan suggested that Judy repay the $1,000 loan she owed by selling marijuana for him. Judy agreed, and by early 1996, she had sold approximately 165 pounds of the narcotic in and around Anderson, selling primarily to members of her family.[1] Typically, Judy would make a drug sale, wait several days before collecting the proceeds and then wire transfer the money to McClellan in Arizona. Other times, Judy's customers made their payments directly to McClellan via wire transfer.

Judy was not the lone marijuana trafficker in the Brewer family. On January 13, 1996, Officer Damon Parkhurst stopped co-defendant John Sargent ("Sargent") and his girlfriend, Donna Brewer, for a traffic violation in Texas. At this time, the two were living in McClellan's trailer in Tucson. After ascertaining that Sargent was driving on a suspended license, Officer Parkhurst directed Sargent to follow him to the Oldham County (Texas) Sheriff's Department. Once at the Department, Parkhurst asked for consent to search the vehicle and Sargent acquiesced. During the ensuing search, he discovered more than eight pounds of marijuana in the trunk of the car.

In early April of 1996, Trooper Shelby Clark ("Clark") of the Arkansas State Police pulled McClellan and his passenger, Richard Wise, over for "hazardous driving" several miles outside of Forrest City, Arkansas. Clark asked for and received written permission to search the automobile, whereupon he discovered 95 pounds of marijuana packaged in large bundles and stashed in suitcases in the trunk of the vehicle. Clark placed both McClellan and Wise under arrest, administered *Miranda* warnings, and transported them to the Forrest City, Arkansas, police headquarters. McClellan telephoned Judy from the police station and instructed her to call in all outstanding marijuana debts in Anderson and travel to Arkansas to post bail for him. Judy collected about $24,000 from

---

**1.** Judy most often distributed marijuana for McClellan in the Anderson area and on one occa-

sion transported 100 pounds of it for him from Indiana to Long Island, New York.

her drug customers and drove to Arkansas with her mother and sister. She posted bail for both McClellan and Wise, $7,500 each in cash, and used the remaining money for legal fees to be applied to McClellan's attorney.

After McClellan's release from confinement, he went to Anderson, Indiana. In May of 1996, he told Pam that Donna wished to move to Anderson as well and suggested that Pam use his truck to pick up Donna in Tucson. Pam made the trip to Arizona, but upon her arrival there, Donna informed her that she was no longer interested in moving to Anderson after all.[2] Several days later, Pam returned to Anderson and returned the truck to McClellan, at which time he informed her that she had transported thirty pounds of marijuana, fixed to the underside of the vehicle, on her drive to Anderson, Indiana, from Tucson. Pam replied that she had no idea that she was transporting drugs.

Meanwhile, Judy continued to sell marijuana for McClellan. She traveled to Tucson in July of 1996 for a week-long visit with Donna and Sargent, and returned to Anderson transporting some eighteen pounds of the drug, twelve pounds of which she "fronted" to Gary Johnson ("Johnson"). McClellan gave Judy two shipments of marijuana the following October and December, totaling 156 pounds. Judy and McClellan moved to Tucson that December, where Judy met McClellan's "source," and once again commenced dealing drugs on McClellan's behalf. Judy also obtained more marijuana for Johnson at this time.

### B. McClellan, Judy and Johnson Are Arrested in Indiana

On January 15, 1997, McClellan flew to Indiana, and the day following, Judy drove his truck to Anderson to visit her parents. After arriving there, Judy received a page from McClellan, instructing her to bring the proceeds from the marijuana she had fronted to Johnson the previous December (1996) to

him (McClellan) at the Budget Inn motel in Daleville, Indiana.[3] Judy and Johnson brought $45,000 in cash to McClellan's room at the motel. Later, McClellan, Johnson and Judy emerged from McClellan's room. Johnson drove away from the hotel in a white Pontiac Trans Am, while Judy and McClellan followed in a red pick-up truck. Four miles down the road, both vehicles were stopped by police. Johnson, McClellan, and Judy were placed under arrest for conspiring to possess marijuana with intent to distribute and transported to the Anderson Police Department where they were separated before questioning.

### C. McClellan Gives Authorities Consent to Search His Motel Room and Pick–Up Truck

Approximately one hour later, DEA Special Agent Gary Alter ("Alter"), IRS Special Agent Steve Weida ("Weida"), and Detective Brent Faust ("Faust") of the Anderson Police Department entered the room in which McClellan was being held. Faust promptly administered McClellan his *Miranda* warnings and he responded with a request for an attorney. Faust agreed with him and stated that he did in fact have a right to counsel and that the interview was over. Agent Faust departed and he proceeded to contact the county prosecutor's office to obtain search warrants for McClellan's room at the Budget Inn, as well as his red pick-up truck.

Meanwhile, Agents Alter and Weida remained with McClellan in the interview room. According to Alter, he told McClellan that since he had requested an attorney he should simply listen to what the two agents had to say and not respond to their statements. McClellan sat quietly as Alter explained to him the process by which he would be appointed counsel, the differences between federal and state prosecutorial procedures, the nature of the charges he was facing,[4] the penalties for those charges, the

---

2. Wise and Wise's sister, Janie Hawn, accompanied Pam to and from Arizona.

3. Acting on a tip that a drug shipment was due in Anderson at the Daleville Budget Inn, members of the Madison County Drug Task Force, the Drug Enforcement Administration ("DEA") and

the Internal Revenue Service ("IRS") set up surveillance at the motel.

4. Specifically, Agent Alter told McClellan that he was being charged with conspiracy to possess with intent to distribute marijuana and also possibly money laundering.

effect of statutory mandatory minimum sentences, and the fact that, considering McClellan's age (68 years old), he could very well die in prison if convicted of the crimes. Alter went on to remark to McClellan that there existed a possibility of receiving a reduced sentence if he were to cooperate with law enforcement officials by consenting to a search of his motel room and truck. This "talk" lasted ten to fifteen minutes, at the end of which Agent Alter asked McClellan whether he would give the police his consent to search his vehicle as well as his room. McClellan expressed his willingness to provide this consent, and Agent Alter left the interview room to get Detective Faust, who procured three consent to search forms for McClellan to sign.[5] Detective Faust read the consent forms to McClellan and gave them to him in order that he might personally review their contents. McClellan read the forms and then signed them, placed his address at the bottom of each one, and handed them to Detective Faust and Agent Weida to inscribe their names therein as witnesses.

After receiving McClellan's signed consent to search the truck and motel room, law enforcement authorities proceeded with their search. In the bed of the vehicle, they found 200 pounds of marijuana bundled in contact paper and hidden under a mattress. Approximately $35,400 in United States currency was found in McClellan's room at the Budget Inn.

### D. Search of McClellan's Residence in Tucson, Arizona

On January 23, 1997, just one week after the foregoing turn of events in Indiana, Vickie Lucio ("Lucio"), a DEA agent, petitioned the United States District Court for the District of Arizona for an additional search warrant to search McClellan's residence in Tucson, Arizona, at 2670 East Summit. The affidavit Lucio submitted in support of the Arizona search warrant alleged, inter alia:

---

5. The first consent form, executed on January 18, 1997, at 11:50 am, described the place to be searched as McClellan's Budget Inn motel room in Daleville, Indiana. The second form, executed at noon on January 18, was for a white and red 1987 Chevrolet four-door automobile registered

2. DEA Special Agent Joseph Kirkland initially received information from a Source of Information (SOI) that an individual named Ottis [sic] McClellan, who resides at 2670 E. Summit, Tucson, AZ., was preparing to transport approximately 600 pounds of marijuana from Tucson, AZ to Pittsburgh, PA. Tucson Electric Company verified that the utilities at 2760 E. Summit, are in the name of Ottis [sic] McClellan.

3. The SOI ... has previously assisted Ottis [sic] McClellan in the transportation of narcotics from the Tucson, AZ area, to various locations, on at least 7 occasions. The SOI, stated to DEA agents, that the normal manner which McClellan and his associates transport the narcotics is through utilizing three or four vehicles, each carrying a portion of the narcotic load.

4. The SOI has informed the DEA that one of the vehicles that McClellan would be utilizing would be a red and white, 1986, Ford F-250, 4 × 4, super cab pick-up truck, bearing Indiana license. Surveillance had observed that aforementioned pick-up truck at the residence located at 2760 E. Summit, Tucson, AZ, on January 6, 1997, through January 14, 1997 on several occasions....

5. According to the SOI, during the week of January 5, 1997, McClellan had contacted the SOI on several occasions to make arrangements for the SOI's travel to the Tucson, AZ area, in order to assist in the transportation of the narcotics.

6. Subsequent to McClellan's initial plan, the SOI was contacted by McClellan and was told not to travel to Tucson, AZ and not to contact McClellan on his home phone. Additionally, McClellan told the SOI that he would travel from Tucson, AZ to Indiana because of a change in plans.

7. After receiving information from the SOI concerning the arrival of Ottis [sic] McClellan in Indiana, DEA Agents of the

---

to McClellan, and the third, executed the same day at 12:05 pm, was for a red 1986 Ford truck with a white cream camper shell, registered to McClellan and driven by him at the time of his arrest.

Indianapolis Office subsequently initiated surveillance of McClellan on January 15, 1997, upon his arrival in Indiana until his arrest on January 18, 1997.

8. On January 18, 1997, five (5) persons were arrested in possession of 210 pounds of marijuana at the Budget Inn located in Daleville, Indiana, including Ottis [sic] McClellan.... [Donna] Brewer also stated to Indiana DEA Agents that she had seen Ottis [sic] McClellan back-up his pick-up truck to a storage facility, located at the residence on Summit and unload bundles of marijuana into the storage facility.

9. Brewer also stated that, in the past, she has delivered monetary proceeds ... from the sale of the narcotics to Ottis [sic] McClellan's residence, located at 2760 E. Summit, Tucson, AZ. She further stated that she believes that there are further drug proceeds at the residence.

The district judge concluded that these allegations were sufficient to establish probable cause and issued a search warrant for McClellan's home. The subsequent search of the residence uncovered materials commonly used in the packaging and transportation of marijuana, products to mask the scent of the drug from canine sniffs, and documents necessary to confirm that McClellan, in fact, lived there.

### E. *Pre–Trial Proceedings*

On February 20, 1997, a grand jury in the Southern District of Indiana returned a two-count indictment against McClellan, Sargent, Johnson and Donna arising out of their involvement in the trafficking of marijuana. Count I charged all four individuals with conspiracy to possess marijuana, with intent to distribute the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged McClellan and Donna with money laundering, contrary to 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h). Johnson and Donna subsequently pleaded guilty, while McClellan and Sargent each entered pleas of not guilty and proceeded to file a number of pre-trial motions with the court, three of which are relevant to the present appeal.

On March 12, 1997, Sargent moved the court for an order directing the Government to disclose all co-conspirator statements it anticipated introducing at trial under Rule 801(d)(2)(E) of the Federal Rules of Evidence, which provides that statements which are offered against a party and are made by a "coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay. The Government's response included a lengthy summary of non-hearsay testimony evidencing a conspiracy among the defendants to traffic in marijuana, as well as their participation in such conspiracy. The proffer also contained summaries of the co-conspirator statements that the Government intended to introduce through the Rule 801(d)(2)(E) hearsay exception. McClellan and Sargent objected to the Government's proffer on two grounds. Initially, they contended that the Government's written submission could not substitute for an evidentiary hearing to determine the admissibility of these co-conspirator statements. And second, they alleged that the Government's failure to specifically detail the nature and content of the co-conspirator statements rendered it impossible to determine whether the statements were made in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E).

Before trial began, the judge held a lengthy hearing concerning the Government's proffer. At the conclusion of the hearing, the district court, in a written order, determined that the Government's proffer contained information sufficient to "conditionally admit" the statements, "subject to [the court's] determination at the close of evidence, that the government did in fact prove by a preponderance of the evidence that the statements were made in furtherance of the conspiracy." The court went on to note that, under *United States v. Shoffner,* 826 F.2d 619, 628 (7th Cir.1987), the Government was required to provide only a "preview [of] the evidence which it believes brings the statements within the co-conspirator rule." Initially, the court made a finding that a conspiracy existed and the witnesses were part of the conspiracy. The judge also directed the Government to supplement its initial 801(d)(2)(E) proffer with the specific co-conspirator statements it contemplated in-

troducing, in addition to the sources of those statements, "in order to facilitate Defendants' preparation for trial." The Government promptly acquiesced to this order.

McClellan also filed a motion *in limine* to suppress all evidence seized (i.e., marijuana and cash) during the January 18, 1997, search of his red pick-up truck and room at the Budget Inn in Daleville, Indiana. He argued that his consent to search the truck and room was obtained through interrogation only after he had requested, and was not afforded, either the presence or the advice of an attorney prior to his discussion with the police, in violation of *Miranda* and the Fifth Amendment. The trial judge denied McClellan's *in limine* motion, stating that "it is well-established that a consent to search is not a self-incriminating statement for Fourth Amendment purposes."

Several months later, McClellan filed a second motion *in limine*, this one relating to all evidence seized pursuant to the January 23, 1997, search of his Tucson, Arizona, residence. In it, he contended that the affidavit Agent Lucio submitted to the court to obtain the search warrant fell short of providing a sufficient basis for the issuing magistrate judge to determine whether the source of information ("SOI") or Donna were reliable, that it failed to set forth the basis of the SOI's knowledge, and that it did not establish a time period as to the events described by the SOI and Donna. The court rejected McClellan's arguments and went on to hold that the affidavit was sufficient to establish probable cause to believe that McClellan was involved in drug trafficking and that evidence of this nature might very well be found at his residence.

### F. *Trial*

The case against McClellan and Sargent went to trial before a jury in the Southern District of Indiana on June 10, 1997. The next day, McClellan filed a motion to reconsider the denial of his second motion to suppress the evidence seized from his Tucson, Arizona, home, this time arguing that Agent Lucio's affidavit contained a false statement made with intentional or reckless disregard for the truth. More specifically, McClellan

contended that while the affidavit stated that "Tucson Electric Company verified that the utilities at 2760 E. Summit, are in the name of Ottis [sic] McClellan," Tucson Electric in fact had no record of electrical service for Otis McClellan at 2760 East Summit. The Government conceded that it had mistakenly transposed the numbers in the address, but asserted that other portions of the affidavit correctly identified McClellan's residence as 2670 East Summit, as did the search warrant, and that the search was conducted at the proper address. The district court denied McClellan's motion to reconsider, finding that the mistake was an "inadvertent" scrivener's error and "not material in establishing probable cause" because the search was in fact ultimately conducted at the proper premises.

During closing arguments of the two-day trial, the Assistant United States Attorney ("AUSA"), in rebuttal to Sargent's attorney's remarks, stated that he would like to "reference John Sargent about facts Mr. Stern [Sargent's counsel] never bothered to deny." Stern objected to this statement on grounds that the Government was commenting on the invocation of his client's right not to testify. The court disagreed. As the court understood the AUSA's line of commentary, the Government was referring to the defense counsel's failure to deny certain facts, rather than Sargent's own failure to deny certain facts. The judge nevertheless ordered the AUSA to abandon the argument as an extra precautionary measure and instructed the jury that "[a] defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." At the Government's request and over the defendant's objections, the court also gave the jury the following "ostrich" instruction:

> If a Defendant maintains that he did not know that marijuana was in the truck, you may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a Defendant had a strong suspicion that things were not what they seemed or a strong suspicion that someone had withheld some important facts, yet

shut his eyes for fear that he would learn, you may conclude that he acted knowingly.

During its deliberations, the jury requested an exhibit list from the court for three of the items presented at trial. The trial judge interpreted this to mean that the jury desired to know what the sources of the exhibits were. She conferred with respective counsel and the defendants in order that she might determine the most appropriate response. Unpersuaded by the defendants' contention that any answer would be an improper comment on the evidence by the court, the judge replied as follows:

Members of the jury, I have received your note requesting additional information regarding three exhibits. According to testimony during the trial, Exhibit 24A was identified as having been seized from Gary Johnson. Exhibits 27A and B were identified as having been seized from Defendant Otis McClellan. The jury must, of course, decide whether to credit that testimony, and what weight, if any, to give to that testimony and/or these exhibits. I trust this is responsive to your request.

The jury continued its deliberations, and later that day, June 12, 1997, returned a verdict of guilty against both defendants on all counts against them. Both McClellan and Sargent were found guilty of one count of conspiracy to possess with intent to distribute and to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. McClellan was also found guilty of one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h).

### G. *Sentencing*

At the sentencing hearing, Sargent's counsel objected to the judge's decision to include in its calculation the thirty pounds of marijuana that Pam unknowingly transported for McClellan from Arizona to Indiana in McClellan's truck.[6] Sargent contended that there was insufficient evidence to sustain the inference that he was involved in hiding the marijuana in the truck before Pam's departure from Arizona. The judge disagreed with this contention and concluded that a reasonable jury could have found Sargent responsible for the thirty pounds and assigned to his criminal history category a total offense level of 26 under the Sentencing Guidelines. He was sentenced to the statutory minimum of 120 months of imprisonment and 8 years of supervised release.

## II. ISSUES

McClellan and Sargent advance a number of issues in their separate briefs. McClellan contends that the trial court committed reversible error in: (1) denying his motion to suppress the evidence seized during the search of his vehicle and motel room; and (2) failing to hold an evidentiary hearing after learning that the affidavit supporting the search warrant on his Arizona home contained suspected false information. Sargent, on the other hand, proffers five grounds as to why he is entitled to a new trial and/or resentencing. Specifically, he contends that: (1) the trial judge erred in denying him a mistrial due to the AUSA's closing remarks allegedly commenting on his failure to testify; (2) the court improperly commented on the evidence when it responded to the jury inquiry during deliberations; (3) the Government's request for an "ostrich" jury instruction should not have been granted; (4) the thirty pounds of marijuana Pam unknowingly transported from Arizona to Indiana was incorrectly included in his sentence; and (5) he was entitled to a hearing on the coconspirator statements the Government intended to introduce at trial.

## III. DISCUSSION

### A. *Constitutionality of Consent to Search*

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court declared that the constitutional protection against compelled self-incrimination, embodied in the Fifth and Fourteenth Amendments, requires that a "custodial interrogation" be preceded by advice to the putative defendant that he has the right to remain silent as well as the right to assistance of counsel. If he re-

---

6. Pam was not charged in the drug conspiracy. She was called as a witness by the Government and testified as to McClellan's participation in the conspiracy.

quests an attorney, "the interrogation must cease" until one is present. *Id.*, 384 U.S. at 474, 86 S.Ct. at 1627. McClellan argues that law enforcement officials obtained his consent to search after he had affirmatively invoked his Fifth Amendment *Miranda* right to assistance of counsel and he was not afforded counsel at that time, and as such, the trial court committed error in denying his motion to suppress evidence discovered by the police in his motel room and in his pick-up truck.[7]

■ Of course, a "custodial interrogation" is the linchpin to triggering *Miranda*'s protections. Neither party disputes that McClellan was "in custody" at the time he consented to the search. Instead, the relevant question here is whether his consent was obtained by reason of an unlawful "interrogation" after he requested an attorney. The Government submits that we need look no further than our opinion in *United States v. Shlater*, 85 F.3d 1251 (7th Cir.1996), to resolve this issue in its favor. In that case, we reaffirmed this circuit's view that a request for "consent to search is not an interrogation within the meaning of *Miranda*" because the giving of such consent is not a self-incriminating statement. *Id.* at 1256 (citing *United States v. Saadeh*, 61 F.3d 510, 515 (7th Cir.1995), *cert. denied*, 516 U.S. 990, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995)); *see also United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993) ("We have held that a consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation.... This view comports with the view taken by every court of appeals to have addressed the issue.") (citation omitted). It follows then, the Government argues, that neither Agent Alter nor

Weida could be said to have "interrogated" McClellan merely by asking him whether he would consent to a search of his motel room and vehicle. We agree with the Government's contention; the rule in *Shlater* is dispositive, and we see no reason to depart from it.

■ McClellan, on the other hand, challenges the statements made by Agent Alter and Agent Weida leading up to, and including, their request for consent to search, not just the request itself. In other words, he states that the police obtained consent to search the pick-up truck and the motel room as a product of interrogation. Initially, we note that whether the agents' "pre-consent" questioning of McClellan constituted an "interrogation" is a question we need not address, as the request for consent to search can be properly separated from whatever illegal interrogation that might have preceded it, thereby making the consent constitutionally valid. *See, e.g., Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.1985) (even though incriminating statements made during the course of an interrogation were properly suppressed because questioning did not cease after defendant requested counsel, the consent to search, and the fruits of that search, need not be suppressed to the extent that "a consent to search is not an incriminating statement.") (citations omitted). It is only when the police coerce the defendant's consent to make a search during an interrogation that such consent will be considered as involuntary and thus unconstitutional. *See Shlater*, 85 F.3d at 1255 ("Consent searches are valid only if the consent was freely and voluntarily given.") (citation and internal quotations omitted). McClellan does not

7. We think it curious that the Government has not chosen to pursue upholding the constitutionality of the search of McClellan's pick-up truck through the inventory search exception to the warrant requirement. That is, "an inventory search may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause." *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). Here, the police arrested McClellan and impounded his truck. It appears as though it could well have been within the authorities' constitutional purview to have conducted an inventory search of

the vehicle at this time, as this is the usual police procedure—at the time police seize and take a vehicle into custody, they frequently conduct an inventory search in order to protect the defendant's property as well as to guard the police from claims of lost or missing items allegedly removed from the vehicle at the time of seizure. *See United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir.1996). Because the Government does not press the issue and because the question of whether McClellan's consent to search his hotel room would still remain even if the Government had pressed this issue, we need not consider the inventory exception.

contend that his consent was anything but voluntary. Of course, any uncounselled confession or *incriminating* statements an accused makes in the wake of questioning, if the accused has properly requested and not subsequently waived an attorney under *Miranda* and he is not afforded counsel, can be suppressed unless the Government is able to demonstrate that he "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628. Once again, a consent to search is not an incriminating statement. For these reasons, McClellan's *Miranda* argument must fail.

### B. *Franks Hearing*

■ McClellan next contends that, despite his request, the trial judge committed error in declining to hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), upon being apprised that a false statement was contained within the affidavit underlying the search of his Tucson, Arizona, home. "We review a district court's refusal to hold a *Franks* hearing for clear error, *and we presume that the affidavit supporting the search warrant is valid.*" *United States v. Hunter*, 86 F.3d 679, 682 (7th Cir.1996) (citation omitted and emphasis added). McClellan faces what we have termed a "formidable task" in attempting to overcome this presumption. *See United States v. Jackson*, 103 F.3d 561, 573–74 (7th Cir.1996).

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* Thus, in support of a request for a *Franks* motion, the petitioner is required to make an offer of proof demonstrating that: (1) the affidavit for the search warrant on his home contained a false statement; (2) the affiant's state of mind in making the false statements was reckless; and (3) the false statement was material to the finding of probable cause (i.e., that probable cause cannot be established without the false statement). *See id.*

■ McClellan's *Franks* argument focuses on the challenged affidavit's statement that "Tucson Electric Company verified that the utilities at 2760 E. Summit, are in the name of Ottis [sic] McClellan," when, in fact, his address was 2670 East Summit. He alleges this to be a false statement, knowingly or recklessly made, and material to the issuing magistrate judge's conclusion that there existed probable cause to search his Tucson, Arizona, home. The experienced trial judge, in denying McClellan's motion to suppress, opined that neither the *mens rea* nor the materiality components of the *Franks* test were met and stated:

> I find no basis to conclude that it was an intentional misstatement by a Government agent in seeking the warrant that was issued on the basis of the affidavit, and that the particular error that is referenced, because it was not intentional, I think it's fair to characterize it as an inadvertent mistake. And the inadvertent mistake is not material in terms of establishing probable cause. It is a very small element in that otherwise detailed statement on the basis of which the magistrate judge made the decision, finding probable cause to warrant the issuance of the search warrant. So this would be a minor matter legally and factually.

We are in full agreement with the trial court's ruling, and hold that the error McClellan alleges in the affidavit does not entitle him to a *Franks* hearing, as it is clear to us that there existed more than sufficient credible information, apart from the allegedly false statement, in the affidavit to support a finding of probable cause. Furthermore, because we are of the belief that the alleged false statement was neither knowingly nor intentionally made and was instead, according to the record, merely a scrivener's error in the affidavit in which the residence's street number was transposed, we are of the opinion that the *mens rea* requirement of the *Franks* test has not been met.

The district court's review of an affidavit to determine whether the unchallenged portions thereof establish probable cause for a warrant to issue is reviewed by this Court to ascertain "whether the district court erred in its determination that the allegations of the affidavit, without the [false] information ..., were sufficient to establish probable cause." *United States v. Muhammad*, 928 F.2d 1461, 1464–65 (7th Cir.1991) (citations omitted). It is important to recognize that probable cause is demonstrated by "facts sufficient to induce a reasonably prudent person to believe that a search ... will uncover evidence of a crime." *Id.* at 1465 (quoting *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir.1990)) (internal quotations omitted).

"[O]ur prior cases have recognized that, in issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept, based on the nature of the evidence and the type of offense, *and that in the case of drug dealers evidence is likely to be found where the dealers live.*" *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996) (emphasis added) (internal quotations and citations omitted). Here, the unchallenged portion of the affidavit was clear and unequivocal in establishing that McClellan had dealt in drugs. The affiant, Agent Lucio, attested that she received information from her source of information that McClellan "was preparing to transport approximately 600 pounds of marijuana from Tucson, AZ to Pittsburgh, PA," and that he had been "arrested in possession of 210 pounds of marijuana at the Budget Inn located in Daleville, Indiana." Agent Lucio also related Donna's statements that "she had seen Ottis [sic] McClellan back-up his pick-up truck to a storage facility, located at the residence on Summit and unload bundles of marijuana into the storage facility" and "that, in the past, she had delivered monetary proceeds ... from the sale of the narcotics to Ottis [sic] McClellan's residence, located at 2760 E. Summit, Tucson, AZ." The magistrate, having received and reviewed the information in the affidavit, was justified in inferring that McClellan was engaged in marijuana trafficking and that marijuana might very well be found in his Tucson home.

McClellan further contends that the information obtained from the Tucson Electric Power Company, that it had no record of providing electrical service at 2760 East Summit, took on greater significance and was, therefore, "critical" to the probable cause determination because the magistrate had no way of knowing whether two of Agent Lucio's sources—the SOI and Donna Brewer—were reliable. We disagree. As the Supreme Court pointed out in *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), the judge considering whether to issue a search warrant must make inquiry into the informant's "veracity" or "reliability" and his or her "basis of knowledge." These are not independent elements, however. Rather, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.*, 462 U.S. at 233, 103 S.Ct. at 2329. Here, the affidavit states that the source of information predicted that McClellan would transport a large amount of marijuana from Tucson to Indiana in a red and white, 1986 Ford pick-up truck, registered to McClellan and bearing Indiana license plates. The SOI also provided information that McClellan did, in fact, reside at 2670 East Summit in Tucson, Arizona. In assessing the credibility of the source of information in the trial judge's denial of the defendant's motion to suppress the evidence seized during the search of McClellan's Arizona home, the court ruled, without a hearing, that

> the reliability of the information provided by the SOI is amply demonstrated by the DEA Agents' independent verification of specific facts, such as McClellan's address and his use of the red Ford pick-up. Most notably, the reliability of the SOI's information regarding McClellan's drug activities and his planned trip to Indiana was unmistakably confirmed by the information regarding McClellan's arrest in possession of 210 pounds of marijuana, in his red Ford pick-up, in Indiana.

Thus, even if we were to assume, *arguendo*, that the basis of the source of information's knowledge was somewhat in error, which we

do not, when we consider that the SOI personally "assisted Ottis [sic] McClellan in the transportation of narcotics ... on at least 7 occasions," his reliability can readily be inferred from the accuracy of his information (i.e., he correctly identified the make, model and color of the vehicle in which McClellan was planning to transport the drugs). Furthermore, the basis of Donna's knowledge was perhaps even stronger than the SOI's— she admitted to being involved in the drug conspiracy and was arrested along with McClellan for conspiring to distribute marijuana.

### C. *Closing Argument Comments*

With McClellan's arguments behind us, we now turn to Sargent's contention that the AUSA was guilty of making inappropriate statements during closing arguments regarding his (Sargent's) Fifth Amendment right to abstain from testifying, in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). He claims that the district court erred in declining to grant him a new trial on this basis. "We review a district court's grant or denial of a mistrial for abuse of discretion, and we assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995) (citations and internal quotation omitted).

During closing arguments, the Government prosecutor directed commentary at the defense's failure to deny certain facts in evidence:

I would also like to talk reference John Sargent about facts that Mr. Stern [Sargent's counsel] never bothered to deny. He never denied that his client spent two days and three nights in a car smaller than the jury box, a truck smaller than the jury box with 201 pounds of marijuana.

He never denied that the truck came from Otis McClellan's house, basically drug central there in Tucson, Arizona, with all that evidence there. He never denied that he got arrested in Vega, Texas.

He never denied that he lived at Otis McClellan's trailer and was involved in a 200–pound marijuana deal where the marijuana was stolen. He never denied that when Pam Brewer was out there, 30 pounds of marijuana were placed into a truck that Pam Brewer was in. The obvious inference is that his client did.

He never denied when Judy Brewer said, look, there is a 200 pound drug deal, and what happened was that the marijuana got stolen from a utility truck that belonged to John Sargent.

He never denied about the junk load. He never explained to you why his client was driving to Indiana with empty suitcases and bicycles in January.

Sargent's counsel objected, and the court overruled the objection, but instructed the prosecutor to abandon this line of argument:

MR STERN: Your Honor, I'm going to object. I think he is commenting on my client not taking the stand, which is really impermissible, and I'd ask that the jury be admonished not to in any way

THE COURT: Well, wait. Let me rule on your objection. I was listening closely, and his references are to your arguments, Mr. Stern. And that's the only possible permissible application of that argument is to counsel's argument because, as we've said on many occasions, there is no obligation for any defendant to present any evidence or to testify. But perhaps you ought to abandon that in case it is misleading.

MR. MINKLER (Government Attorney): Okay.

At the close of trial, while the jury was in deliberations, Sargent moved for a mistrial based on the theory that the Government's remarks cited above allegedly referred to the defendant's failure to testify. The trial court ruled that the remarks referred to were made in response to the defendant's counsel's statements and merely inferred that Sargent's counsel failed to present any evidence from any source to contradict the Government's evidence that: (1) McClellan spent three nights in a truck smaller than the jury box with 200 pounds of marijuana; (2) McClellan was arrested in Texas; (3) thirty pounds of marijuana was placed under Pam's car without her knowledge and he failed to

notify her of it until her arrival in Anderson; and (4) the drug evidence in the truck came from McClellan's house. The trial judge denied the motion because the prosecutor's remarks were directed as a response to the defense counsel's failure to deny these four facts, rather than at Sargent's unwillingness to testify in his own defense. We are convinced that the experienced trial judge reached the proper result, albeit perhaps for a reason different from the one we invoke below.

 For more than thirty years now, the Fifth Amendment has provided protection to defendants by forbidding *direct* "comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615, 85 S.Ct. at 1233 (footnote omitted). This constitutional prohibition also encompasses *indirect* commentary on the defendant's decision not to testify, that is, where the Government characterizes its proffer of evidence as "uncontradicted," "undenied," "unrebutted," "undisputed," "unchallenged," or "uncontroverted," and the only person capable of contradicting, denying, rebutting, disputing, challenging, or controverting the evidence at issue is the defendant. *See Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir.1997) (citations omitted). Although he does not label them as such, the remarks Sargent challenges are of the indirect type. Indeed, nothing the prosecuting attorney said during closing, or at any time for that matter, could properly be interpreted as directly referencing Sargent's unwillingness to testify. We are left with the question of whether the prosecutor engaged in an "indirect" *Griffin* violation.

The rub here, as the Government points out on appeal, is that the contested portions of the AUSA's closing argument were directed at *Sargent's attorney's* failure to deny the facts in evidence, not at *the defendant Sargent's own* failure to deny. Although we have previously held that in situations where the defendant was the only person who could have denied the Government's evidence, it

makes little difference whether the prosecution was referring to the defendant's or his counsel's failure to make such a denial as the reference would, by default, go to the defendant's failure to testify; that is not the case here. *Cf. United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996) ("A prosecutor's comment that the government's evidence on an issue is 'uncontradicted,' 'undenied,' 'unrebutted,' 'undisputed,' etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself.") (citing cases). Donna, who was Sargent's girlfriend, confidant and co-conspirator, was available to testify at trial and rebut every bit of evidence that the Government prosecutor claimed Sargent's attorney had failed to deny.[8] It was Donna who drove with Sargent from Arizona to Indiana with 200 pounds of marijuana in their possession. She and Sargent were arrested in Vega, Texas, for possessing eight pounds of marijuana. Because Donna was available to testify at trial and since the defense counsel was aware of the fact that Donna was available to rebut the very evidence that the Government argued Sargent's counsel had failed to offer evidence to rebut, Sargent's Fifth Amendment claim is without merit. The court thus did not abuse its discretion in denying Sargent a new trial on this basis.

### D. *Ostrich Instruction*

 Sargent next contends that the district judge erred in giving the jury the following "ostrich instruction" at the Government's request:

If a Defendant maintains that he did not know that marijuana was in the truck, you may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a Defendant had a strong suspicion that things were not what they seemed or a strong suspicion that someone had withheld some important facts, yet

---

8. The trial judge twice remarked that Donna was available to testify and that if she refused to do so, he would subpoena her and make her available to the defense if they thought it necessary to "involve" her.

shut his eyes for fear that he would learn, you may conclude that he acted knowingly.

"We review determinations concerning jury instructions for abuse of discretion, considering the evidence and all reasonable inferences therefrom in the light most favorable to the government." *United States v. Neville*, 82 F.3d 750, 759 (7th Cir.1996) (citation omitted). And when considering the appropriateness of a jury instruction, our inquiry is whether, looking at the charge as a whole, the jury was misled in any way and understood the issues and its duty to determine those issues. *See United States v. Fawley*, 137 F.3d 458, 467 (7th Cir.1998).

 The ostrich, or conscious avoidance, instruction is typically given in cases like the one before us where the defendant is prosecuted under a criminal statute with a "knowingly" *mens rea* component, and he or she "[1] claims a lack of guilty knowledge and [2] there are facts and evidence that support an inference of deliberate ignorance."[9] *Id.* at 466–67 (citation and internal quotation omitted); *see also United States v. Nobles*, 69 F.3d 172, 185 (7th Cir.1995); *United States v. Rodriguez*, 53 F.3d 1439, 1447 (7th Cir.1995); *United States v. Kladouris*, 964 F.2d 658, 668 (7th Cir.1992); *United States v. Gonzalez*, 933 F.2d 417, 433–34 (7th Cir.1991). Sargent concedes that the first of these two requirements is met here—his defense was that he did not know that he was transporting some 200 pounds of marijuana in the truck he drove from Arizona to Indiana. Instead, he contends that the second prong is not satisfied, that there are neither facts nor circumstances warranting an inference that he acted with deliberate indifference concerning the criminal wrongdoing going on around him.

 Before proceeding any further with our discussion, we think it necessary to elucidate upon what it means for a defendant to be deliberately indifferent as well as the type of evidence that is sufficient to draw an inference thereof. Sargent intimates that some type of overt act is required. That simply is not the law of this circuit—the inference of deliberate indifference "need not be shown by overt or physical acts." *Neville*, 82 F.3d at 760. While it is true that the defendant's *deliberate* ignorance separates carelessness from avoidance, "a legitimate *inference* of willfulness is sufficient" to justify giving an ostrich instruction. *Id.* It is likewise true that the distinction between carelessness, on the one hand, and avoidance, on the other, is a fine one involving close calls. *See id.* When a "borderline" case does arise, the nature of our highly deferential standard of review would dictate that we sustain the district court's ruling.

From our review, we are convinced that the evidence in the record makes it abundantly clear that if Sargent did not know he was trafficking marijuana, he was deliberately indifferent to his active participation in criminal wrongdoing. Sargent had been arrested within the time frame of the charged conspiracy for possessing more than eight pounds of marijuana, and just four months later, in April 1996, McClellan was pulled over on the highway and arrested for transporting some 95 pounds of the drug in the trunk of his vehicle. Sargent drove McClellan's truck, at McClellan's direction, on a three-day trek from Arizona to Indiana. The vehicle was later found to contain approximately 200 pounds of marijuana bundled in wood-grained contact paper. Sargent had been living with Pam in McClellan's Tucson, Arizona, trailer just prior to his trip to Indiana, and a subsequent search of the trailer uncovered a number of items commonly used by those individuals trafficking in marijuana such as four rolls of fabric softener[10] and nine cans of disinfectant (to mask the scent of the drug during canine sniffs), twelve burlap bags (individuals referred to as "mules" backpack the marijuana in burlap bags from Mexico to Tucson, located only sixty miles from the Mexican border), twelve

---

9. Sargent was convicted of violating 21 U.S.C. § 841(a)(1), which makes it "unlawful for any person *knowingly* or intentionally … to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." (emphasis added).

10. The trailer had neither a clothes washer nor dryer.

rolls of plastic wrap and four rolls of contact paper (to wrap the marijuana for transport). The record reflects that Sargent and Donna were the only persons living in McClellan's trailer at the time. Based on the totality of the facts and circumstances set forth in the record before us, we are convinced that the jury could have drawn the "legitimate inference" that, if Sargent in fact did not know he was trafficking in marijuana, he was consciously and willfully avoiding the likelihood of his participation in that crime.

### E. District Court's Response to Jury Inquiry

The fourth of Sargent's five bases for appeal involves a challenge to the district judge's response to a request by the jury for certain exhibits during deliberations. The decision to deliver exhibits and information to the jury room is within the sound discretion of the court. See United States v. Gross, 451 F.2d 1355, 1359 (7th Cir.1971) (citation omitted); United States v. Guy, 924 F.2d 702, 708 (7th Cir.1991). "We will disturb this decision only when the district court abused its discretion." Guy, 924 F.2d at 708 (citing United States v. Garner, 837 F.2d 1404, 1425 (7th Cir.1987)).

While deliberating over Sargent's and McClellan's fate in this case, the jury requested further information in a note to the Judge reading, "Please provide an exhibit list for the items presented, No. 27A, No. 24A, No. 27B." The court, after conferring with and giving the attorneys, including both defense counsels, an opportunity to express their views, interpreted this communication as a request for information as to "where those exhibits come from" and prepared a response, to wit:

> Members of the jury, I have received your note requesting additional identifying information regarding three exhibits. According to the testimony during the trial, Exhibit 24A was identified as having been seized from Gary Johnson, Exhibits 27A and B were identified as having been seized from Defendant Otis McClellan. The jury must, of course, decide whether to credit that testimony and what weight, if any, to give to that testimony and/or

these exhibits. I trust this is responsive to your request.

Sargent's attorney expressed his grave opposition to the judge's response. In his view, the court was prohibited from replying to the jury's request because it would "overemphasize" additional details regarding the exhibits. The judge disagreed, and sent the jury the above-quoted message, amended to include a sentence reminding the jury that it "must, of course, decide whether to discredit that testimony, and what weight, if any, to give to that testimony and/or these exhibits."

Just what Sargent is attempting to argue on appeal is less than clear. He admits that the court's answer did not include facts not found in the record. Nor does he claim that the reply set forth a misstatement of law or fact. Sargent has devoted only three sentences of his brief to making an argument on this issue, whereby he posits that the trial court is obligated to respond to jury confusion with "concrete accuracy" and that the judge exercises significant influence over the jury. If he, in fact, is suggesting that the judge in this case did not respond to the jury request with "concrete accuracy," he fails to explain why, and we are not in the business of formulating arguments for the parties. See Kurzawa v. Jordan, 146 F.3d 435, 447 (7th Cir.1998). Sargent has thus waived that facet of his claim on appeal. See Otto v. Variable Annuity Life Ins. Co., 134 F.3d 841, 854 (7th Cir.1998) ("This court has refused to consider unsupported or cursory arguments.... [The plaintiff] has devoted all of three sentences to the argument on this issue. The matter is waived.") (citation omitted); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments ... are waived [on appeal]."). And as for his observation that the jury accords great weight to the court's words and directions, " '[t]he Court presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' " United States v. Linwood, 142 F.3d 418, 426 (7th Cir.1998) (quoting

*Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985)). Should the jury request clarification on a matter during deliberations, it is when the court responds with a misleading, incorrect, unclear or unresponsive (i.e., not with "concrete accuracy") statement of law or fact, or with facts not in evidence, that we might have cause for concern. *See United States v. Adcox,* 19 F.3d 290, 294 (7th Cir.1994). As noted above, Sargent admits that the court's answer did not contain false or misleading information outside the record. And while a judge's response to a jury's question must not highlight one witness' testimony over another's, the nature of the jury's question at issue here (from whom or from where certain exhibits were seized) is not something that would benefit the Government at Sargent's expense. Finally, we add that the trial judge, before answering the jury's question, held a hearing and gave both prosecution and defense counsel an opportunity to express their opinions. The Supreme Court has previously held that a jury's question must be "answered in open court and ... petitioner's counsel should have been given an opportunity to be heard before the trial judge responded." *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (citations omitted). In complying with the dictates of *Rogers,* the trial judge reviewed the jury's question in open court and provided clear instructions to the jury that it was to decide for itself whether to credit or discredit the testimony and exhibits in question. *See Adcox,* 19 F.3d at 294. We hold that the judge's response to the jury's question was proper and not an abuse of discretion.

### F. Sentencing

Sargent argues further that the sentencing judge erred in computing his sentence to include the thirty pounds of marijuana Pam unknowingly transported from Arizona to Indiana. Sargent's sole basis at sentencing for excluding the thirty pounds of marijuana from the total amount of drugs used to calculate his sentence was that there existed no evidence, circumstantial or direct, to establish that he stowed the narcotics in the undercarriage of the vehicle Pam drove from Arizona to Indiana. In other words, Sargent's objection went solely to the alleged insufficiency of the evidence against him with respect to his involvement in trafficking the thirty pounds.[11] On appeal, Sargent has shifted gears and instead contends that the testimony used to establish that he stashed the marijuana under the truck was unreliable, uncorroborated hearsay.

Normally, we would review the court's calculation of the quantity of narcotics attributable to Sargent for clear error. *See United States v. Benitez,* 92 F.3d 528, 536 (7th Cir.1996) (citing cases). However, Sargent objected to the inclusion of the thirty pounds of marijuana on a ground different than the one on which he bases his appeal. To preserve an issue for our review, a party must make a proper, timely objection at trial or sentencing on the ***same specific ground*** he or she is appealing. *See United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988). "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *Id.* Although Sargent made a specific, timely objection at sentencing to the inclusion of the thirty pounds of marijuana by claiming that there was insufficient evidence to establish that he stowed the narcotics beneath the vehicle Pam drove from Arizona to Indiana, he now raises a different argument before us on appeal in claiming that the testimony establishing that he hid the marijuana was unreliable and uncorroborated hearsay. In the circum-

---

11. The judge twice queried Sargent's attorney whether his objection went to the sufficiency of evidence against his client. Defense counsel responded in the affirmative both times:

THE COURT: What you are really arguing is an insubstantial or insufficient evidence claim with respect to that part of the conspiracy; right?

MR. STERN: That's correct, Your Honor, absolutely.

* * *

THE COURT: So the question now is whether or not that evidence is sufficient to allow the Court at sentencing to include the 30 pounds as part of the amount of marijuana involved in this case for which Mr. Sargent ought to be held responsible.

MR. STERN: That's correct, Your Honor.

stance where an issue has not been raised prior to appeal at trial or sentencing, that issue is not properly preserved for appeal and "must be reviewed under the strict standards of the plain error doctrine ... which allows appellate courts to correct only 'particularly egregious errors' for the purpose of preventing a miscarriage of justice." *Lieberman v. Washington,* 128 F.3d 1085, 1095 (7th Cir.1997) (quoting *United States v. Whaley,* 830 F.2d 1469, 1478 (7th Cir.1987)).

 In response to Sargent's newly submitted claim that Pam's testimony was unreliable hearsay, the Government states that the district court correctly found that "a reasonable jury could draw an inference from the testimony of Pamela Brewer that Sargent was responsible for loading 30 pounds of marijuana into the vehicle Pamela Brewer delivered from Arizona to Indiana." It is true that while due process requires "that a defendant have a reasonable opportunity to rebut contested hearsay and that contested hearsay be reliable," *United States v. Campbell,* 985 F.2d 341, 348 (7th Cir.1993) (citation omitted), a sentencing judge is free to "consider a wide variety of information that would be inadmissible at trial, including hearsay," *id.* (citation and internal quotation omitted). "The district court is empowered to consider this broad range of information so that it may impose the sentence most appropriate to the defendant's circumstances." *Id.* (citation and internal quotation omitted). "In light of the judge's duty to protect society and impose a fair and just sentence upon the defendant it is only reasonable to allow the judge *wide latitude in the type of information he can consider when sentencing.*" *United States v. Harty,* 930 F.2d 1257, 1267 (7th Cir.1991) (citation and internal quotation omitted). When it comes to assessing the credibility and reliability of a witness whose hearsay testimony provides the basis for a sentencing determination,

> we do not second-guess the sentencing judge because he or she has had the best opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expres-

sions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record.*

*United States v. Garcia,* 66 F.3d 851, 856 (7th Cir.1995) (citation and internal quotation omitted). Sargent offers us nothing in support of his contention that the additional thirty pounds of marijuana should not have been counted against him for sentencing purposes and in fact we have been unable to find anything in the record that would compel us to "second-guess" the sentencing judge's conclusion in accepting Pam's testimony as reliable. Both McClellan's and Sargent's attorneys attempted to impeach Pam's credibility at trial, but quickly abandoned their respective cross-examinations after failing to elicit an impeaching response from her. Sargent also had ample opportunity to, and in fact did, cross-examine Pam regarding her testimony that McClellan had told her that she transported the thirty pounds of marijuana in his truck. We hold that Pam's challenged hearsay testimony was reliable and that Sargent had an opportunity to rebut it. As such, there was no error, much less a "plain" one, which would warrant a reversal of Sargent's sentence.

### G. *Admission of 801(d)(2)(E) Evidence*

 The last of Sargent's arguments is that the district court erred in allowing the Government to introduce a "tremendous number" of undisclosed statements of co-conspirators at trial. He gives but one example of a statement he is challenging on appeal—that McClellan told Pam she had transported, albeit unknowingly, thirty pounds of marijuana from Arizona to Indiana. Thus, we will rule only on this one statement and not the alleged "tremendous number" of statements Sargent refers to; for the Court of Appeals does not have "a duty to comb the record in order to discover possible errors." *United States v. Williams,* 877 F.2d 516, 519 (7th Cir.1989).

 While a statement, other than one made by the declarant while testifying at trial, is inadmissible as hearsay if it is offered to prove the truth of the matter asserted, *see*

Fed.R.Evid. 801(c) and 802, such a statement is not hearsay if it "is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). On March 27, 1997, Sargent moved to compel the Government to submit to the court each and every 801(d)(2)(E) coconspirator statement it intended to introduce at trial. The Government promptly tendered the following written proffer of the co-conspirator statements it planned to offer in evidence:

> Statements between and among Judy Brewer, Otis McClellan, Gary Johnson, Donna Brewer, Ozzie Hernandez, and John Sargent and other members of the conspiracy regarding: deliveries of marijuana from Arizona to Indiana; making arrangements to meet; the manner in which the marijuana would be delivered and received in Indiana; the role and participation of various members of the conspiracy; arrangements for the transportation, receipt and delivery of marijuana [from] Arizona to Indiana; arrangements and payments with regard to transportation expenses for delivering marijuana; and arrangements concerning payments of currency to be returned to various members of the conspiracy.

Sargent filed a motion thereafter in opposition to this proffer. He argued that the court should have conducted a pre-trial hearing to determine the admissibility of the 801(d)(2)(E) statements and that the nature of the statements made it impossible to ascertain whether they were made in furtherance of the conspiracy. The district judge "conditionally overruled" Sargent's objections to the introduction of the co-conspirator statements and "conditionally admitted" them, subject to a "determination at the close of the evidence, that the Government did in fact prove by a preponderance of the evidence that the statements of the coconspirators were made in furtherance of the conspiracy."

At trial, while examining Pam, the prosecuting attorney posed questions regarding her trip out to Arizona in May of 1996 and, more specifically, asked her whether McClel-lan had informed her that she had transported thirty pounds of marijuana, wired in the undercarriage of the vehicle she was driving, when she arrived in Indiana. Pam responded that McClellan had told her as much when she arrived in Anderson, Indiana, and that she recalled telling him that she had no knowledge that she was transporting drugs until he so advised her. At no time when this testimony was elicited did Sargent make an objection on any grounds. Now, on appeal, he contends that the trial judge committed error in allowing the introduction of Pam's testimony into evidence because the Government's pre-trial written proffer did not specifically set forth what statements it intended to elicit from her. We disagree.

In *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978), we espoused that "'if it is more likely than not that [1] the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible'" under Rule 801(d)(2)(E). *Id.* at 1134 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977)). As we pointed out in *United States v. Rodriguez*, 975 F.2d 404, 409–10 (7th Cir.1992), relying on our holding in *Santiago* setting forth that there is more than one acceptable procedure which the district court may rely on in determining whether the hearsay is admissible:

> One method we have expressly approved ... is to make a preliminary determination, based on Government proffers of evidence, whether to conditionally admit the statements subject to a reevaluation at trial if the Government fails to provide evidence supporting the assertions contained in the proffer. However, [w]e have also approved other procedures a district court can employ in making the preliminary admissibility determination required by *Santiago*, including the following: *the court can rule on each statement as it is elicited based on the evidence the Government has adduced to that point; the court can, **even in the absence of a pretrial proffer**, conditionally admit the body of coconspirator's statements subject to the Government's eventual proof of the foundational elements (the penalty for not so providing*

*being a possible mistrial); or the court can hold a "full blown" preliminary hearing to consider all evidence concerning the statements. United States v. Andrus, 775 F.2d 825, 836–37 (7th Cir.1985)* (**we discouraged the latter as inefficient and potentially duplicative**).

(emphasis added) (citations and internal quotation omitted). The defendant claims that the Government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial. Relying on the language quoted above, the court has more than one method to use when considering the admissibility of co-conspirators statements. In fact, as noted in *Rodriguez*, this Court has gone so far as to "discourage[ ] the [practice of holding a pre-trial testimonial hearing] as inefficient and potentially duplicative." *Id.* Thus, we refuse to hold that the trial court committed error in admitting Pam's testimony without first having required the Government to include her statement in its pre-trial 801(d)(2)(E) proffer.

## IV. CONCLUSION

The convictions and sentences of McClellan and Sargent are affirmed.

AFFIRMED.